## 22-2256 (L), 22-2296

# United States Court of Appeals
### *for the*
# Fourth Circuit

CCWB ASSET INVESTMENTS, LLC; and M.C. DEAN, INC.,

*Claimants-Appellants,*

EBC ASSET INVESTMENT, LLC; JEFFREY J. CONNAUGHTON; IWONA HOWLEY; RICHY CASTRO; TONY DAVIS; ROCHELLE KATZ; BARBARA LOUDERBACK; SCOTT D. OSER; OJAS PATEL; PULIN PATEL; DHAVAL SHUKLA; NISHANT SHUKLA,

*Claimants,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND AT BALTIMORE IN CASE NO. 1:18-CV-02844-RDB RICHARD D. BENNETT, SENIOR U. S. DISTRICT COURT JUDGE

# OPENING BRIEF OF APPELLANTS

ROBERT F. MUSE
RACHEL M. CLATTENBURG
RONALD KOVNER
LEVY FIRESTONE MUSE LLP
900 17th Street, NW, Suite 1200
Washington, DC 20006
(202) 845-3215
rmuse@levyfirestone.com
rmc@levyfirestone.com
rk@levyfirestone.com

*Counsel for Claimants-Appellants*

– and –

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff,*

UNITED STATES OF AMERICA,

*Intervenor/Plaintiff,*

MASSACHUSETTS ATTORNEY GENERAL,

*Intervenor,*

– v. –

GREGORY S. MILLIGAN,

*Receiver-Appellee,*

RANDEL LEWIS,

*Receiver,*

– and –

KEVIN B. MERRILL; JAY B. LEDFORD; CAMERON R. JEZIERSKI; GLOBAL CREDIT RECOVERY, LLC; DELMARVA CAPITAL, LLC; RHINO CAPITAL HOLDINGS, LLC; RHINO CAPITAL GROUP, LLC; DEVILLE ASSET MANAGEMENT LTD; RIVERWALK FINANCIAL CORPORATION; AMANDA MERRILL; LALAINE LEDFORD; MAUREEN STEPHENS; ERICKA JOHNSON,

*Defendants.*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __22-2256__        Caption: __CCWB Asset Investments, LLC v. Gregory Milligan__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__CCWB Asset Investments, LLC__
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.      Does party/amicus have any parent corporations?                    ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                    ☐YES ☑NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation?                    ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
      party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
      caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
      corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational
      victim of the criminal activity and (2) if an organizational victim is a corporation, the
      parent corporation and any publicly held corporation that owns 10% or more of the stock
      of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Robert F. Muse                    Date:    December 9, /2022

Counsel for: CCWB Asset Investments LLC

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __22-2256__      Caption: __CCWB Asset Investments, LLC v. Gregory Milligan__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__M.C. Dean, Inc.__
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.      Does party/amicus have any parent corporations?                    ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                    ☐YES ☑NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation?                    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?          ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational
victim of the criminal activity and (2) if an organizational victim is a corporation, the
parent corporation and any publicly held corporation that owns 10% or more of the stock
of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Robert F. Muse                          Date:    December 9, /2022

Counsel for: M.C. Dean, Inc.

Print to PDF for Filing

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT OF JURISDICTION ..................................................... 1

ISSUES PRESENTED ........................................................................ 1

INTRODUCTION .............................................................................. 2

STATEMENT OF THE CASE ........................................................... 3

    I.    The Ponzi Scheme ................................................................ 3

    II.    Proceedings Below ............................................................... 5

        A.    The Claims Procedure and the Receiver's Distribution Plan .................................................................. 5

        B.    The Receiver Miscalculated Current Recovery for the Dean Investors ........................................................ 6

        C.    The Dean Investors' Objections and the Receiver's Reply ............................................................ 8

        D.    The Dean Investors Agreed to Accept the Receiver's Disbursement Number, Mooting Any Issue of Administrative Difficulty ......................................... 10

        E.    The Motions Hearing ................................................. 10

        F.    The District Court's Orders ....................................... 11

SUMMARY OF THE ARGUMENT ................................................. 12

STANDARD OF REVIEW ............................................................... 13

ARGUMENT ..................................................................................... 14

    I.    CALCULATING THE PRE-RECEIVERSHIP RECOVERY UNDER *HUBER* IS NOT ADMINISTRATIVELY DIFFICULT ....................................................................... 14

        A.    The Receiver's Reliance on *Huber* ......................... 15

i

B.  Application of the *Huber* Rule to CCWB and M.C. Dean Is Neither Extremely Difficult nor Impracticable ...........18

  i.   CCWB...........................................................................18

  ii.  M.C. Dean..................................................................20

C.  Application of *Huber* to the Dean Investors' Reinvestments will not Disturb the Interim Distribution or Create Administrative Difficulty with Respect to Other Investors ............................................................21

II.  THE DISTRICT COURT ABUSED ITS DISCRETION IN NOT FOLLOWING *HUBER* FOR REINVESTMENTS ..................21

III. THE DISTRICT COURT ERRED IN FINDING THAT THE DEAN INVESTORS DERIVED ANY BENEFIT FROM REINVESTED WITHDRAWALS .....................................25

IV.  REINVESTMENTS SHOULD BE TREATED THE SAME AS ROLLED-OVER DISTRIBUTIONS, WHICH THE RECEIVER AGREES DO NOT CONFER A BENEFIT ON THE INVESTOR ...............................................................29

CONCLUSION ........................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Am. Metal Forming Corp. v. Pittman*,
  52 F.3d 504 (4th Cir. 1995) ...................................................................13

*Behrmann v. Nat'l Heritage Found.*,
  663 F.3d 704 (4th Cir. 2011) .................................................................13

*Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.*,
  550 F.2d 189 (4th Cir. 1977) .................................................................13

*Holland v. Florida*,
  560 U.S. 631 (2010) ...................................................................... 22, 23

*Holmberg v. Armbrecht*,
  327 U.S. 392 (1946) ..............................................................................23

*Horwitt v. Flatiron Partners, LP*,
  No. 21-2245, 2023 WL 192500 (2d Cir. Jan. 17, 2023) ......................23

*In re Receiver*,
  No. 3:10-3141-MBS, 2011 WL 2601849 (D.S.C. July 1, 2011) ..........16

*In re The Vaughan Co.*,
  543 B.R. 325 (Bankr. D.N.M. 2015) .....................................................16

*In re United Energy Corp.*,
  944 F.2d 589 (9th Cir. 1991) ...................................................................3

*Monetti, S.P.A v. Anchor Hocking Corp.,*
  931 F.2d 1178 (7th Cir. 1991) ...............................................................24

*Morris v. Wachovia Sec., Inc.*,
  448 F.3d 268 (4th Cir. 2006) .................................................................14

*SEC v. Byers*,
  637 F. Supp. 2d 166 (S.D.N.Y. 2009), *aff'd sub nom. SEC v. Malek*,
  397 F. App'x 711 (2d Cir. 2010), and *aff'd sub nom. SEC v. Orgel*,
  407 F. App'x 504 (2d Cir. 2010) .................................................... 21, 30

*SEC v. Callahan*,
  193 F. Supp. 3d 177 (E.D.N.Y. 2016) ............................................ 16, 17, 28

*SEC v. Enter. Trust Co.,*
  No. 08 Civ. 1260, 2008 WL 4534154 (N.D. Ill. Oct. 7, 2008) ...........................22

*SEC v. Huber,*
  702 F.3d 903 (7th Cir. 2012) ........................................................ *passim*

*SEC v. Parish*, No. 2:07–cv–00919,
  2010 WL 5394736 (D.S.C. Feb. 10, 2010) .................................................. 16, 25

*SEC v. Quan,*
  870 F.3d 754 (8th Cir. 2017) ...............................................................21

*U.S. Commodities Futures Trading Comm'n v. Barki, LLC*,
  No. 3:09 CV 106–MU, 2009 WL 3839389 (W.C.N.C. Nov. 12, 2009) .............13

*Wells, Waters & Gases v. Air Products & Chemicals,*
  19 F.3d 157 (4th Cir. 1993) ..................................................................24

*Westberry v. Gislaved Gummi AB,*
  178 F.3d 257 (4th Cir. 1999) ......................................................... 13, 14

## Statutes & Other Authorities:

15 U.S.C. § 77t ...........................................................................................1

15 U.S.C. § 77u ..........................................................................................1

28 U.S.C. § 1291 ........................................................................................1

28 U.S.C. § 1331 ........................................................................................1

UCC § 2-201 ............................................................................................24

Richard A. Posner, *The Problems of Jurisprudence* 95 (1990) ...............................24

## STATEMENT OF JURISDICTION

The United States District Court for the District of Maryland had jurisdiction pursuant to 28 U.S.C. § 1331 because the claims at issue presented federal questions arising under the Securities Act, 15 U.S.C. § 77t and the Exchange Act, 15 U.S.C. § 77u. Appellants filed a Notice of Appeal on December 5, 2022. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291, as this is an appeal from a final decision of a district court of the United States.

## ISSUES PRESENTED

1.    Did the district court abuse its discretion in approving the Receiver's plan for distribution which unfairly and unreasonably treats the funds the Appellants withdrew from the Ponzi scheme, reinvested, and then lost, as pre-Receivership recoveries to be credited against their proposed distribution, thereby depriving them of millions of dollars they would have received from the proposed distribution had they not made the withdrawals in the first place?

2.    Did the district court abuse its discretion in approving a plan for distribution based on the clearly erroneous factual finding that calculating the Current Recoveries for the Appellants would be "administratively difficult"?

1

# INTRODUCTION

In its simplest form, the issue before this Court is whether victims of a Ponzi scheme should be denied their fair recovery because they were duped into reinvesting money they had previously withdrawn from the same scheme.

CCWB Asset Investments, LLC, and M.C. Dean, Inc. (the "Dean Investors" or "Appellants") are victims of Defendants' massive Ponzi scheme. When the Dean Investors received what they believed were profits from their investments in the Ponzi scheme, they would reinvest those phantom profits back into what turned out to be a fraudulent scheme, rather than keep or benefit from them. In the end, they lost millions of dollars.

Following the investigation and exposure of the Ponzi scheme, the Securities Exchange Commission ("SEC") sued the schemes' masterminds in district court, and the court appointed a Receiver to collect and preserve assets and calculate the recoveries available for victims of the scheme from the assets. The Receiver then proposed a distribution plan for distribution of the assets to the victims of the fraud. The district court erroneously approved the Receiver's distribution plan.

This appeal relates to the district court's erroneous treatment of the Appellants' reinvested funds, and it turns on the application of one case, *SEC v. Huber*, 702 F.3d 903 (7th Cir. 2012), an opinion authored by Judge Richard Posner. That opinion explains why the distribution plan proposed by the Receiver is unfair

and why the court below abused its discretion in approving it. *Huber* explains that an investor who withdraws and then reinvests the funds he has withdrawn is in no better position than if he had not made withdrawals in the first place, and thus those withdrawn and reinvested funds should be ignored and should not count against the investor's distribution. *See id.* at 907. The district court disregarded this equitable principle.

This Court should vacate the district court's order and remand with instructions to adhere to Judge Posner's opinion—that a victim's money, withdrawn and then reinvested back into a Ponzi scheme, should not reduce the recovery to the victim, but that such withdrawals and reinvestments should be treated as rescinded when calculating the amount of distributions the Dean Investors are entitled to receive.

## STATEMENT OF THE CASE

### I.      The Ponzi Scheme

This case stems from a sophisticated Ponzi scheme[1] perpetrated by three Defendants in the underlying criminal case: Kevin B. Merrill, Jay B. Ledford and

---

[1] "A Ponzi scheme is a fraudulent arrangement in which an entity makes payments to investors from monies obtained from later investors rather than from any 'profits' of the underlying business venture. The fraud consists of funnelling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment." *In re United Energy Corp.*, 944 F.2d 589, 590 n.1 (9th Cir. 1991).

Cameron Jezierski. From 2013 through November 2018, the Defendants raised more than $345 million from approximately 230 investors by selling investments in the same and often fictitious debt portfolios. JA 53. Defendants would periodically make payments to the investors purporting to represent solid returns on their investments, but which consisted of commingled funds of other investors. The Appellants referred to below and here as the "Dean Investors"2 would routinely reinvest these payments with the Defendants. When the Ponzi scheme collapsed, the Dean Investors together lost more than $22 million, JA 246-247, making them amongst the biggest victims of the fraud.

The criminal matter was investigated and exposed in 2018, and the SEC sued the Defendants, alleging violations of the Securities Act of 1933 and the Securities Exchange Act of 1934. JA 53-103. On September 13, 2018, the Court appointed Gregory S. Milligan as Receiver to marshal and preserve the assets of the Defendants and their affiliate entities ("the Receivership Parties"), JA 104-131, 135-136, "with the goal . . . to maximize the recovery to defrauded investors, as alleged in the

---

[2] CCWB is a pooled fund registered in Florida composed of equally contributing members of the Dean family and friends. M.C. Dean is a Dean family owned electrical design-build and systems integration firm that invested in the Ponzi scheme through a wholly owned subsidiary, Dean Capital Investments, LLC beginning in 2017. In the district court, EBC Investments, LLC was also a claimant and part of the "Dean Investors." However, by stipulation dated March 2, 2023, EBC has dismissed its appeal in this matter.

Complaint." JA 136. Ultimately, the Receiver recovered approximately $64 million dollars. JA 532; *see also* Joint Status Rep. (ECF 679, filed Nov. 3, 2022) at ¶ 1.

The Dean Investors fully cooperated with this court authorized process, producing substantial and detailed financial information regarding the nature and extent of their investments in the Ponzi scheme. JA 260-264. Counsel for the Dean Investors advised the Receiver that each of the Dean Investors had reinvested their withdrawals from the Receivership Parties back into the Receivership Parties. JA 441.

## II.    Proceedings Below

### A. The Claims Procedure and the Receiver's Distribution Plan

On the Receiver's motion, the Court established a claims procedure and notification process, through which the investors in the Ponzi scheme reviewed their respective Transactions Statements and earlier submissions, and either verified that the amounts listed on the Transaction Statements were accurate or indicated where there was disagreement. As instructed, the Dean Investors verified the accuracy of the amounts listed. JA 440.

Following the claims procedure process, the Receiver filed his Motion for Order Approving Distribution Plan and Interim Distribution ("Receiver's Motion") on November 17, 2021, JA 210-239, seeking approval of an interim distribution of $50 million. JA 222. The Receiver proposed using what courts have referred to as

the "Rising Tide" distribution method, JA 224-231, where each claimant would recover at least 48.86% of the principal amount of its investment.[3]

To determine whether a claimant was entitled to share in the distribution, the Receiver calculated a percentage for each claimant called the "Current Recovery." JA 244-248. The Current Recovery is the Receiver's calculation of the percentage each investor recovered of the principal amount of its investment prior to the Receivership. JA 225, 245. It is the critical figure in this case, determining the amount, if any, that the investor will receive from the interim distribution. In the Receiver's plan, if an investor's Current Recovery is equal to or greater than 48.86%, that investor is considered to have already received his share of the distribution and thus receives nothing. JA 243. If an investor has taken no withdrawals before the collapse of the scheme, his Current Recovery is 0% and he will receive 48.86% of his principal investment. An investor who has recovered a percentage of his principal investment less than 48.86% will be entitled to a distribution that raises his percentage to 48.86%.

### B. The Receiver Miscalculated Current Recovery for the Dean Investors

The Receiver's erroneous calculation of Current Recovery for the Dean Investors is the focus of this appeal. The Receiver calculated Current Recovery by

---

[3] That percentage increased slightly to 49.39% when the Receiver made the interim distribution following the district court's approval of his plan.

counting the amounts withdrawn and reinvested by the Dean Investors as money recovered by Appellants before the Receivership, instead of ignoring these amounts of withdrawals given that they were reinvested into the Ponzi scheme. He counted each reinvestment of previously withdrawn funds as a new investment,[4] and calculated the Dean Investors' Current Recovery percentages by dividing the total of withdrawals (including all funds subsequently reinvested) by the total of investments (also including all funds reinvested).[5] JA 321-324; 519-520, 562.

The effect of the Receiver's method of calculation was to inflate the Current Recovery percentage and thereby cause the Dean Investors to recover considerably less in the proposed distribution. Specifically, the Receiver treated CCWB as having invested approximately $22 million into the Receivership Parties and withdrawn and

---

[4] That is clearly a fiction. Since any funds withdrawn from the scheme were not "profits" or returns on investments, but rather the commingled funds of other investors, the Dean Investors could only be considered to have withdrawn and thus reinvested their own capital, so each reinvestment was simply a restoration of capital and not a new investment.

[5] To illustrate, using simpler numbers, the Receiver's incorrect calculation of the Dean Investors' Current Recoveries, say that CCWB deposited $100,000 into the Receivership Parties. Later, CCWB withdrew $50,000 from the Receivership Parties and then reinvested $25,000 back into the Receivership Parties, where it became available for withdrawal by other investors. In this example, it is clear that CCWB recovered only $25,000 of its principal amount invested ($100,000). Its Current Recovery *should* be 25%, or $25,000/$100,000. *Instead*, the Receiver's method considers CCWB as having invested $125,000 and recovered $50,000, and thus the Receiver would calculate CCWB as having a Current Recovery of 40%—total withdrawals ($50,000) divided by total "investments" ($125,000).

recovered approximately $11 million. JA 321-322. That is clearly wrong based on the numbers in the record. If CCWB had, in fact, recovered approximately $11 million, its cash balance plus disbursements would equal approximately that amount. Yet, according to the Receiver's own numbers, CCWB's disbursements plus retained cash was approximately $800,000, more than $10 million shy of what the Receiver claims CCWB recovered. JA 519-520, 563. The Receiver incorrectly determined that CCWB's Current Recovery was 51.39% and M.C. Dean's Current Recovery was 17.43%. JA 244-248.[6] CCWB thus received nothing under the Receiver's distribution, and M.C. Dean received significantly less than its entitlement.

### C. The Dean Investors' Objections and the Receiver's Reply

The Dean Investors filed Objections to the Receiver's Motion, establishing that: once each of the entities began investing with the Defendants, they did not invest anywhere else, JA 252-253, 261-262; with the exception of small amounts of retained cash, each had reinvested all of its withdrawals, JA 252-254, 261-262; the Receiver incorrectly and unfairly included their reinvested withdrawals as pre-Receivership recoveries when calculating their Current Recoveries under Rising Tide, *id.*; and the Receiver should not have considered such withdrawals as benefits

---

[6] In the Receiver's distribution plan, Investor I-0019 is CCWB and Investor I-0022 is M.C. Dean.

to the Dean Investors, in accordance with Judge Posner's opinion in *Huber*, JA 256-258. Had the Receiver applied the *Huber* approach to reinvestments, CCWB would have been entitled to a distribution of approximately $4.67 million (rather than nothing), and M.C. Dean would have been entitled to an additional amount of approximately $1.2 million. JA 445-447; 563.

The Receiver replied on January 31, 2022, contending that the Objections should be overruled because the *Huber* approach—treating reinvested withdrawals as having been rescinded—is dicta and should not be followed, JA 319, and applying *Huber* in this case would be "very administratively difficult." JA 320. The Receiver based his claim of administrative difficulty on a need to recalculate the Current Recoveries of 65 other similarly situated investors, and the fact that CCWB had commingled withdrawn funds with funds received from other sources in a bank account from which it made both disbursements and reinvestments. JA 320-321. Significantly, the Receiver's Reply concedes that only a relatively small amount—$683,370—of the approximately $11 million withdrawn by CCWB was retained and disbursed, JA 321-322, thereby acknowledging that everything else (more than $10 million) went back into the Receivership Parties and thus was not recovered.

As to M.C. Dean, the Receiver also impliedly acknowledged that there was no issue of administrative difficulty with respect to determining what withdrawals

were reinvested because it did not commingle withdrawals and did not disburse withdrawn funds to non-Receivership Parties. JA 323-324; *see also* JA 516.

### D. The Dean Investors Agreed to Accept the Receiver's Disbursement Number, Mooting Any Issue of Administrative Difficulty

The district court granted the Dean Investors leave to file a Surreply. With respect to alleged administrative difficulty, the Dean Investors noted the Receiver's concession that his claim of administrative difficulty did not apply to M.C. Dean, and, as to CCWB, that investor was willing to accept the Receiver's disbursement number and assume that all such disbursements were made with withdrawals from the Ponzi scheme, in which case CCWB would still have a much lower Current Recovery and be entitled to millions of dollars more in the interim distribution. JA 441-443.

### E. The Motions Hearing

The district court held a hearing on all objections to the Receiver's Motion on November 15, 2022. At the hearing, the Dean Investors represented that they were stipulating to the Receiver's disbursement total for CCWB, and that all the disbursements were made with funds withdrawn from the Receivership Parties, JA 521, thereby eliminating administrative difficulty in applying *Huber*'s reasoning. JA 519-521, 562, 563. The district court instructed counsel for the Receiver and the Dean Investors to agree upon an amount to be set aside to protect the rights of the Dean Investors pending this appeal. The court refused to order that any funds be set

aside for the 65 other investors whom the Receiver described as having reinvested withdrawals, indicating that it was too late for them to assert similar claims. JA 535-36.

### F. The District Court's Orders

That same day, the district court entered an order granting the Receiver's Motion and authorizing an interim distribution of $50 million. JA 565-567. The court also directed the Receiver to withhold the agreed-upon $9 million, pending this appeal on the disputed claims by the Dean Investors. *Id.*

On November 18, 2022, the Court entered an order (hereinafter "Order") overruling the Dean Investors' Objections on the grounds that: i) the method of treating reinvested withdrawals set forth in *Huber* is dicta and had not been adopted by any other court, ii) applying the *Huber* approach would be "extremely difficult from an administrative perspective, would require extensive time and resources that would further diminish the limited assets of the Receivership Estate, and is prone to inaccuracies," iii) "the sheer number of transactions between the [Dean Investors] and the Merrill Ponzi scheme is such that identifying and tracing the origin of all of the [Dean Investors'] funds for each reinvestment would be impracticable," and iv) "when each entity withdrew money, there was a benefit from the withdrawal, however big or small." JA 571-573.

The Dean Investors filed a Notice of Appeal on December 5, 2022. JA 576-577.

## SUMMARY OF THE ARGUMENT

The district court, in this equity matter, abused its discretion in approving the Receiver's distribution plan. First, the district court's Order relies on the clearly erroneous factual finding that applying the *Huber* approach as to reinvested funds here is administratively difficult, even though the undisputed facts in the record show that the calculation is straightforward and does not require any tracing of the flow of funds. Moreover, the record establishes that the Receiver essentially conceded that the calculation of Current Recovery for M.C. Dean under the *Huber* approach is not administratively difficult. Second, the district court abused its discretion in approving a plan that does not apply the *Huber* approach to reinvestments, and thus is unfair and unreasonable. Equity principles demand a flexible approach—not a mechanical application of the Rising Tide method. The district court ignored these principles of equity. Third, the plan is unfair and unreasonable because it punishes the Dean Investors for being repeat victims of the Defendants' fraud. The very nature of the Ponzi scheme was designed to victimize those who reinvested. The Dean Investors did not benefit from the funds that they withdrew, reinvested and lost, and it was an abuse of discretion for the district court to find that those reinvestments conferred a benefit justifying treatment of the

reinvestments as pre-Receivership recoveries. Fourth, the plan is unfair and unreasonable because it arbitrarily treats rolled-over investments differently from reinvestments.

The district court should not have approved this plan for distribution, and this Court should vacate the district court's order and remand with instructions to calculate the Dean Investors' Current Recovery pursuant to the *Huber* approach.

## STANDARD OF REVIEW

The district court was sitting in equity when it approved the Receiver's distribution plan and overruled the Dean Investors' objections. *U.S. Commodities Futures Trading Comm'n v. Barki, LLC,* No. 3:09 CV 106–MU, 2009 WL 3839389, at *1 (W.C.N.C. Nov. 12, 2009) ("when approving a [Receiver's] distribution plan, a district court sits in equity"). "It is well established that a court's grant or denial of equitable relief is reviewed for abuse of discretion." *Behrmann v. Nat'l Heritage Found.*, 663 F.3d 704, 709 (4th Cir. 2011). A "judge's discretion is not boundless and must be exercised within the applicable rules of law or equity." *Am. Metal Forming Corp. v. Pittman*, 52 F.3d 504, 508 (4th Cir. 1995) (quoting *Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.*, 550 F.2d 189, 193 (4th Cir. 1977)).

An abuse of discretion occurs when the decision of the district court "is guided by erroneous legal principles" or "rests upon a clearly erroneous factual finding." *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 261 (4th Cir. 1999). This Court

13

will reverse for abuse of discretion if, after review of the record and reasons for the

decision, it "form[s] 'a definite and firm conviction that the court below committed

a clear error of judgment in the conclusion it reached upon a weighing of the relevant

factors.'" *Morris v. Wachovia Sec., Inc.*, 448 F.3d 268, 277 (4th Cir. 2006) (quoting

*Westberry,* 178 F.3d at 261).

**ARGUMENT**

**I.    CALCULATING THE PRE-RECEIVERSHIP RECOVERY UNDER *HUBER* IS NOT ADMINISTRATIVELY DIFFICULT**

The district court's Order relies to a great extent on the Receiver's claim that

"administrative difficulty" precluded a determination of the Dean Investors' pre-

receivership recovery in accordance with the equitable treatment set forth in *Huber*:

> With equity in mind, the Receiver aptly highlights that "the 'maximum balance' approach as requested in the Objection would be extremely difficult from an administrative perspective, would require extensive time and resources that would further diminish the limited assets of the Receivership Estate, and is prone to inaccuracies."
>
> *     *     *
>
> Further, the sheer number of transactions between the Virginia Group entities and the Merrill Ponzi Scheme is such that identifying and tracing the origin of all of the Group's funds for each reinvestment would be impracticable.

JA 573. To the contrary, applying the principle set forth in *Huber* to the calculation

of the Dean Investors' Current Recoveries is simple and straightforward. The district

court's findings of administrative difficulty are clearly erroneous, and thus its Order

must be set aside as an abuse of discretion. *See Westberry,* 178 F.3d at 261.

14

A. **The Receiver's Reliance on *Huber***

With not a little irony, the Receiver's Motion in support of his proposed distribution plan, using the Rising Tide method, relies primarily on the Seventh Circuit opinion in *Huber*. JA 224-229. The Receiver reproduced charts from *Huber* showing how Rising Tide works when some investors take and keep withdrawals and others take no withdrawals. JA 227-228. The Dean Investors do not dispute the application of *Huber*. It is when the Receiver ignores Judge Posner's comments distinguishing reinvested funds that the Dean Investors and the Receiver differ.

The *Huber* decision makes clear that counting withdrawals that an investor takes and keeps as part of that investor's distribution is fair and reasonable; it is fair to reduce the amount of an investor's distribution of receivership assets by the amount the investor recovered before the collapse of the Ponzi scheme. In that instance, an investor has profited from the fraud. For example, following *Huber*'s analysis, if Investor 1 has invested $10,000 in a Ponzi scheme and withdrawn $5,000 prior to the scheme's collapse, and Investor 2 has invested $8,000 and withdrawn nothing, then Investor 1, having recovered 50% of his investment, should not get any part of the distribution unless and until Investor 2 recovers 50% of his loss. As the *Huber* court notes, "investors who have made withdrawals will tend to be better off when the Ponzi scheme collapses than investors who have made no withdrawals

because the former lose less than they would have lost had they not drawn down their investment." *Id*. at 907.[7]

But *Huber* treats withdrawals that are reinvested much differently from withdrawals that are retained. Judge Posner understood that investors, like CCWB and M.C. Dean, who are defrauded into *reinvesting* their withdrawals have received no benefit or advantage over other investors and are in no better position than if they had taken no withdrawals, and so it would be unfair and inequitable to consider investors who withdraw and then reinvest their withdrawals as having recovered some percentage of their investments:

> We are given pause, however, by the situation of an investor who having withdrawn some money from the Ponzi scheme then reinvests it. Suppose he had initially invested $150,000 and then,

---

[7] *See also SEC v. Callahan*, 193 F. Supp. 3d 177, 199 (E.D.N.Y. 2016) (explaining that the Rising Tide method "prevents an investor who previously received funds as a withdrawal from benefitting at the expense of other investors in the scheme who did not receive any withdrawals and therefore, lost the entire amount of their investment.") (citing *Huber,* 702 F.3d at 906); *In re The Vaughan Co.*, 543 B.R. 325, 337 (Bankr. D.N.M. 2015) ("The rising tide method is designed so early investors do not receive a windfall from later investors' money, and later investors are not penalized based on the timing of their investments"); *In re Receiver,* No. 3:10-3141-MBS, 2011 WL 2601849, at *2 (D.S.C. July 1, 2011) ("Thus, under the Rising Tide method of distribution, claimants are allowed to retain previously received funds, but those funds are credited against claimants' respective pro-rata distributions from the Receiver Estate"); *SEC v, Parish*, No. 2:07–cv–00919, 2010 WL 5394736, at *3 (D.S.C. Feb. 10, 2010) ("Payments received by the investor prior to the scheme's collapse are treated as 'distributions' on par with the distributions to be made by the Receiver, so that prior amounts paid by [the defendant] are credited against (i.e., subtracted from) the amount that would otherwise be paid from the receivership estate.").

shortly after withdrawing $50,000, he reinvested it, thus restoring his balance to $150,000, all of which he lost when the scheme collapsed. Under the rising tide method he would be credited with having invested $200,000 ($150,000 plus $50,000) and having recouped a quarter of that amount by his withdrawal, and thus would receive a reduced share of recovered assets compared to a person who had invested $150,000 and lost it without any interim withdrawals. *We can't see why those two investors should be treated differently*, as would be obvious if the withdrawal and reinvestment had occurred on successive days. *In cases of withdrawal followed by reinvestment, the investor's maximum balance in the Ponzi scheme ($150,000 in our example) should be treated as his investment; the withdrawals, having in effect been rescinded, should be ignored.*

*Huber,* 702 F.3d at 907 (emphasis added).

Judge Posner's concern speaks directly to the circumstances of the Dean Investors. On a regular and recurring basis, they reinvested their distributions precisely as the fraud had intended investors might do. "In such a situation, the positive effect on the investor of withdrawing his money from the scheme is erased because he re-invested the money he took out back into the scheme and therefore, ended up losing the same amount of money that he would have lost had he decided not [to] take his money out in the first instance." *SEC v. Callahan*, 193 F. Supp. 3d at 195–96 (citing *Huber*, 702 F.3d at 907).

The Receiver minimized or disregarded Posner's analysis, calling it "merely [ ] dicta." JA 319. But that only begs the question: Does the distribution plan lead to a fair and equitable result? Judge Posner clearly understood the inequity of treating reinvested withdrawals as pre-Receivership recoveries and stated that when applying

17

the Rising Tide method, equity requires that withdrawals by an investor that are reinvested in the Ponzi scheme should be treated as having been "rescinded," in other words, the withdrawal amounts (which were then reinvested) should not be considered pre-Receivership recoveries and should be ignored.

### B. Application of the *Huber* Rule to CCWB and M.C. Dean Is Neither Extremely Difficult nor Impracticable

The district court adopted the Receiver's representations regarding the complexity of tracing withdrawals as grounds for its decision that the application of *Huber* to reinvestments would be too administratively difficult. JA 573. That was clear error, because the undisputed facts demonstrated that CCWB's and M.C. Dean's Current Recoveries could have been calculated applying the *Huber* principle with relative ease and with little expenditure of time and resources.

### i.    CCWB

The Receiver relied on the facts that CCWB deposited amounts withdrawn from the Receivership Parties and amounts received from other sources into the same account and made reinvestments and disbursements from that account, to argue that it would be extremely difficult and costly to trace the flow of funds to determine what withdrawals were reinvested and what withdrawals were used to make disbursements. JA 321-322; 501-502.

At the hearing, without contradiction by Receiver's counsel, counsel for the Dean Investors established that the Receiver needs only two numbers to calculate

Current Recovery: (1) the amount of principal invested and (2) the amount of pre-Receivership funds retained. JA 522, 563. Current Recovery equals the second number divided by the first. The first number is undisputed. It is $11,100,374. JA 261. The second number—the amount actually recovered pre-Receivership—is also undisputed, as explained at the hearing. Specifically, since CCWB invested only in the Ponzi scheme, the money that left CCWB went either to the Receivership Parties, as investments, or was paid out as disbursements for such items as tax and credit card payments. JA 519. Counsel for CCWB stipulated to the Receiver's calculation of the total amount of disbursements made by CCWB while it was investing with the Receivership Parties and stipulated that all such disbursements were made with funds withdrawn from the Receivership Parties. JA 519-521. That amount—approximately $683,370 plus a small, undisputed amount of retained cash (approximately $125,509)—is the second number. JA 563. Since both numbers needed to calculate Current Recovery are undisputed, the Receiver could calculate Current Recovery for CCWB with no administrative difficulty.[8]

Contrary to the Receiver's claim and the district court's finding, tracing the flow of funds is not necessary. Using the Receiver's numbers and a simple chart, JA 520-521, 563, counsel did the very calculation that the district court found to be

---

[8] According to this calculation, Current Recovery is equal to ($683,370 + $125,509)/$11,100,374, which is 7.29%. JA 563.

extremely difficult and impracticable, by adding CCWB's disbursement total and retained cash, a sum representing withdrawals not reinvested, and dividing that sum by the total principal invested (treating reinvestments as rescinded). That calculation —applying the *Huber* approach—yields a Current Recovery for CCWB of 7.29% as opposed to the Receiver's figure of 51.39%. JA 520-521, 563. A Current Recovery of 7.29% would give CCWB a distribution of approximately $4.67 million (rather than nothing).

### ii.     M.C. Dean

As to M.C. Dean, which also only invested in the Ponzi scheme, the Receiver never presented facts from which the Court could conclude that applying the *Huber* approach would be extremely difficult and costly. To the contrary, the Receiver conceded that M.C. Dean did not commingle funds, that it "maintained two bank accounts . . . solely for the purpose of receiving distributions from and making subsequent investments with the Receivership Parties. . . . As such, it is clearer which subsequently invested funds were made from Receivership Party distributions." JA 323-324; *see also* JA 516 (describing M.C. Dean as "a more direct in-and-out type of entity"). Therefore, the district court's finding of "administrative difficulty" with respect to M.C. Dean is not supported by the facts in the record, even as presented by the Receiver. Application of *Huber* yields a Current Recovery for M.C. Dean of

0.4%, as opposed to the Receiver's figure of 17.43%.[9] A Current Recovery of 0.4%

would give M.C. Dean an additional $1.2 million in distribution funds.

C. **Application of *Huber* to the Dean Investors' Reinvestments will not Disturb the Interim Distribution or Create Administrative Difficulty with Respect to Other Investors**

A decision by this Court favorable to the Dean Investors will not require the

Receiver to make any adjustment to the prior interim distribution or recalculate the

Current Recovery of any other investor, as the district court ordered that funds be

set aside only to cover disputed claims and was emphatic in rejecting the Receiver's

suggestion that funds might also need to be set aside to cover other investors "that

potentially are in similar situation[s]" to the Dean Investors but who had not filed

objections, JA 535.

## II.  THE DISTRICT COURT ABUSED ITS DISCRETION IN NOT FOLLOWING *HUBER* FOR REINVESTMENTS

Eliminating extreme administrative difficulty as an obstacle allows this Court

to focus on what is really at issue: equity. The district court's review of a proposed

distribution plan must focus on whether the plan is "fair and reasonable." *SEC v.*

*Quan*, 870 F.3d 754, 761 (8th Cir. 2017). "The standard is whether a distribution is

equitable and fair in the eyes of a reasonable judge." *SEC v. Byers*, 637 F. Supp. 2d

---

[9] This is arrived at by dividing the retained cash ($50,000) by the amount of principal invested by M.C. Dean ($11,548,134). JA 262-263.

166, 174 (S.D.N.Y. 2009) (quoting *SEC v. Enter. Trust Co.,* No. 08 Civ. 1260, 2008 WL 4534154, at *3 (N.D. Ill. Oct. 7, 2008)). Here, the district court failed to apply equity principles.

This case—where it is undisputed that the Dean investors withdrew funds and reinvested substantially all those funds back into the Ponzi scheme—is precisely the sort of situation that demands "flexibility" rather than a "mechanical" application of the Rising Tide method. *Holland v. Florida*, 560 U.S. 631, 649–50 (2010). The remedy that would prevent injustice to the Dean Investors has already been crafted and explained by the Judge Posner in *Huber* who anticipated the very problem associated with reinvested funds and cautioned against applying the Rising Tide method mechanically. 702 F.3d at 904.

The district court erroneously rejected the *Huber* approach on the grounds that (1) the solution for reinvestments was dicta and there was no precedent for the *Huber* approach, and (2) because it discerned the *Huber* approach as "subjective" and "not founded in equity." JA 573. Neither ground has merit.

First, in refusing to apply the *Huber* approach because it is dicta that has not been applied by other courts, the district court failed to heed the Supreme Court's caution against relying too much on precedent to decide equity cases. Because the district court is exercising its equity powers in reviewing a distribution plan, it has broad discretion to determine a plan that is equitable for that particular case. "Equity

eschews mechanical rules; it depends on flexibility." *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946). Therefore, while the court may "draw upon decisions made in other similar cases for guidance" and "exercise judgment in light of prior precedent," the court must do so "with awareness of the fact that specific circumstances, often hard to predict in advance, could warrant special treatment in an appropriate case." *Holland*, 560 U.S. at 650. Here, the fact that the *Huber* approach has not yet been adopted by another court should not have prevented the lower court from applying the *Huber* principles as to reinvestment, because it is necessary to achieve equity. Indeed, while the approach has not been adopted, neither has it been rejected.

As a starting point, relatively few federal cases have addressed objections to distribution plans using the Rising Tide method and no federal appellate court appears to have addressed the *Huber* approach to reinvestment following Judge Posner's decision.[10] That is why the Order's concern about the *lack* of "precedent" serves no analytical purpose. The lack of precedent approving *or rejecting* Judge Posner's analysis is not a barrier. The question is whether the application of Judge

---

[10] Counsel is aware of only one court of appeals case that addresses an objection concerning the treatment of funds that are put back into a Ponzi scheme. *See Horwitt v. Flatiron Partners, LP*, No. 21-2245, 2023 WL 192500, at *1 (2d Cir. Jan. 17, 2023). In *Flatiron*, however, the Second Circuit did not engage with the issue of withdrawn and reinvested funds, because the appellant argued that its transfer back to the Ponzi scheme of certain returned funds should *not* be treated as a reinvestment following distribution. *Id.* at *2. And most importantly, the Second Circuit did not even mention *Huber*.

Posner's analysis is necessary to achieve an equitable result. It is. Here, dicta would have served its intended purpose. Judge Posner knew that the reinvested funds were not in play in *Huber* but was speaking to another day when the problem he anticipated would become reality, as it has here.[11]

Second, the district court's decision is also based on the clearly erroneous finding that the *Huber* approach is "a subjective test that is not founded in equity," JA 573, relying on the Receiver's argument at the hearing that the Receiver would need to make "a subjective judgment call on what actually were funds that legitimately were reinvested." JA 503. But as already explained, the Dean Investors accepted the Receiver's calculation of what funds were disbursed and retained as the amount of their Current Recovery, thus avoiding the need for tracing or any "subjective judgment call[s]." The Receiver did not have to determine what portion of the amounts disbursed came from the distributions; the Dean Investors agreed to assume that all disbursements came from the distributions and should be considered

---

[11] Nothing prohibits this Court from looking to well-considered dicta when deciding a case. See, e.g., *Wells, Waters & Gases v. Air Products & Chemicals,* 19 F.3d 157, 161 (4th Cir. 1993) (relying on dicta in an opinion authored by Judge Posner in *Monetti, S.P.A v. Anchor Hocking Corp.,* 931 F.2d 1178, 1182 (7th Cir. 1991), in deciding that the Agreement at issue met the requirements of UCC § 2-201 and could be enforced). Judge Posner, in a more academic mode, spoke to the values and uses of dicta: "I am arguing only that when there is no holding, when there are only dicta, their weight ought to be determined by their intrinsic merit rather than by their official source." Richard A. Posner, The Problems of Jurisprudence 95 (1990).

in calculating Current Recovery. JA 519-520. What's more, it is not a "subjective judgment" whether funds went back into the Ponzi scheme. The Receiver readily admits that "[c]ertainly, a large percentage eventually went back into the Ponzi scheme." JA 503. Indeed, the Receiver's counsel did not challenge the Dean Investors' presentation at the Motions Hearing showing that the Receiver's calculation was based on a fiction that the Dean Investors had received and retained all of their withdrawals. *See* JA 518-530.

## III.  THE DISTRICT COURT ERRED IN FINDING THAT THE DEAN INVESTORS DERIVED ANY BENEFIT FROM REINVESTED WITHDRAWALS

The district court abused its discretion in approving a distribution plan that is patently unfair and unreasonable because it penalizes the Dean Investors for putting money back into the scheme rather than keeping it, even though such reinvestments were not to the disadvantage of, and did not cause harm to, any other investor. The Receiver is effectively using the Dean Investors to subsidize distributions to other investors, as the Dean Investors' reinvested amounts that the Receiver unfairly credited against their distribution became part of the Receivership Estate available for distribution to other investors.[12]

---

[12] Under Rising Tide, one of the reasons for crediting withdrawals against the Receiver's distribution is because those withdrawals diminish the estate available for distribution to all investors. *See SEC v. Parish*, 2010 WL 5394736, at *8 (discussing why the Rising Tide method of crediting pre-receivership withdrawals is preferable, noting that "[i]f the payments to some investors had not been made,

The district court approved the Receiver's inclusion of reinvested withdrawals as pre-Receivership recoveries and attempted to distinguish *Huber* by finding that "when each entity withdrew money, there was a benefit from that withdrawal, however big or small." The court did not state in its Order what such a benefit might be, but explained its thinking at the hearing:

> Then to that extent, to the extent that the Dean Group benefitted to some extent by money coming to them, these six individuals, these three entities, there is a benefit, there is a flow that came back to them as a result, correct?
>
>   *      *      *
>
> I understand that some of the money went back into the Ponzi scheme to Merrill and his crew, but there's some that came out to be utilized for whatever purposes and to that extent there was a benefit and a return from being in the Ponzi scheme; is that not correct?
>
>   *      *      *
>
> [B]ut to the extent that money—unless 100 cents on the dollars is reinvested back, there has to be some calculation of benefit, is there not, Mr. Muse, benefit to the—that enures [sic] to the Dean Group of some sort, whether it's paying taxes, covering overhead, whatever it is?

JA 510-511. In other words, the district court found that there is a benefit from withdrawals to the extent the withdrawn funds are used to pay taxes, cover overhead,

---

the estate in this case would presumably be larger and the distribution to all investors would be greater."). Here, the estate was not diminished, was as large as it would have been had the withdrawals not been made in the first place, and the withdrawals did not cause any reduction in the amount available for distribution. Therefore, the reason for crediting the withdrawals against the Receiver's distribution does not exist where the withdrawals are reinvested.

or otherwise "utilized for whatever purposes." The Dean Investors agree; but to the extent their withdrawals were reinvested and *not* used for other purposes, the district court erred in holding that they conferred a benefit on the Dean Investors.

The district court's finding of a benefit does not support its refusal to apply the *Huber* approach, because what is at issue here is *not* "some that came out to be utilized for whatever purposes," but rather funds that came out and went back into the Ponzi scheme. The district court's reasoning does not attribute a benefit to those withdrawn and reinvested funds, and thus they should not be treated as recovered.

Both Judge Posner in *Huber* and the Dean Investors agree that investors derive a benefit when they take withdrawals and retain or use them for their benefit, as noted by the district court. *See* JA 511 (noting "there has to be some calculation of benefit …whether it's paying taxes, covering overhead…"). But that is not the type of transaction at issue here and which *Huber* identified as requiring different treatment in accordance with equitable principles. Indeed, the fact that CCWB did benefit from the relatively small amount of withdrawals used to pay such items as taxes and credit cards,[13] serves to draw a sharp and significant contrast between those withdrawals which do benefit the investor and the vast majority of withdrawals that

---

[13] As noted, M.C. Dean did not make any disbursements with withdrawn funds and so received no such benefit.

CCWB was duped into reinvesting. As to the latter, there was no benefit from putting the funds back into the scheme. *See SEC v. Callahan*, 193 F. Supp. 3d at 195–96.

The district court's finding of a benefit is different from what the Receiver argued was the benefit derived from withdrawals that are reinvested. The Receiver argued that the Dean Investors received a benefit from the withdrawals they were defrauded into reinvesting because "they had the benefit of access to the [withdrawn] funds that other victims didn't," JA 502. That argument is flawed as well. To the extent the district court found that mere "access," i.e., having a choice of what to do with withdrawn funds before reinvesting them, is a "benefit" that renders the *Huber* approach inapplicable, it is misreading *Huber*.

The investor in Judge Posner's example in *Huber* had the same supposed "benefit" when he withdrew $50,000—he had "access" to it for some period of time. 702 F.3d at 907. Judge Posner's investor "chose" to reinvest his withdrawal, just as CCWB and M.C. Dean did here. Under the Receiver's theory, that investor would have derived a benefit, however ephemeral, merely from having a choice of what to do with his withdrawal. But in *Huber*, Judge Posner correctly determined that the investor did not benefit from having mere access to the withdrawn $50,000, and that it should not be treated as a pre-Receivership recovery. Clearly then, *Huber* does not view the investor who is defrauded into reinvesting as having a meaningful benefit from the withdrawal that warrants treating the reinvested funds as pre-Receivership

28

recoveries. To the contrary, "the withdrawals, having in effect been rescinded, should be ignored." *Huber,* 702 F.3d at 907. It cannot be seriously disputed that with respect to the funds that were withdrawn and reinvested, CCWB and M.C. Dean are in no better position than if they had not withdrawn those funds in the first place. *Id.* The supposition of a phantom benefit is unwarranted, misleading and, in effect, punishes the Dean Investors for being victims of the fraud.

## IV.   REINVESTMENTS SHOULD BE TREATED THE SAME AS ROLLED-OVER DISTRIBUTIONS, WHICH THE RECEIVER AGREES DO NOT CONFER A BENEFIT ON THE INVESTOR

The Receiver actually makes the Dean Investors' case for them by arbitrarily and inequitably treating their reinvestments differently than their rolled-over distributions. On a number of occasions, Defendants advised Mr. Dean that one or more of the Investors had payments coming and the Dean Investors' manager instructed the Defendants not to send the payment, but to simply apply the payment to the investor's account. JA 261. The Receiver correctly did not treat those amounts as pre-Receivership withdrawals. The Dean Investors were told they had a distribution, and instead of receiving it and sending it back in, they simply rolled it over. The Receiver did not consider the Dean Investors to have benefitted from the rolled-over amounts, and thus did *not* credit those rolled-over amounts towards the Dean Investors' Current Recovery calculation. JA 317.

Yet there is no relevant difference between an amount that was paid to an Investor and reinvested with Defendants, and an amount that was simply added to the Investor's account without making the round trip from Defendants to the Investor and back to the Defendants. In each case, the funds become part of the Receivership estate, and the Investor is left in the same position and has received no benefit. *See SEC v. Byers*, 637 F. Supp. 2d at 182–83 (approving distribution plan that did not count rolled-over distributions towards the investor's recovery, and instead counted them as out-of-pocket losses), *aff'd sub nom. SEC v. Malek*, 397 F. App'x 711 (2d Cir. 2010), and *aff'd sub nom. SEC v. Orgel*, 407 F. App'x 504 (2d Cir. 2010). The plan's differing and arbitrary treatment of rolled-over amounts and reinvested amounts shows that it is not fair and equitable, and the district court abused its discretion in approving this plan.

## CONCLUSION

The Receiver states that "the primary goal of a district court and receiver in establishing a distribution plan is to set a plan that is fair, equitable, and treats victims in factually similar cases equally." JA 318. But this cannot occur by victimizing the Dean Investors with a formula whereby they subsidize the recovery of the other investors. For the foregoing reasons, the Court should vacate the district court's order, and hold that CCWB's pre-receivership recovery is equal to the agreed-upon amount of disbursements plus retained cash, divided by capital invested; and M.C.

30

Dean's pre-receivership recovery is equal to retained cash divided by capital invested. This Court should remand with instructions for the Receiver to make CCWB's and M.C. Dean's distributions, from the set aside $9 million, consistent with these calculations of Current Recovery.

Dated:   March 13, 2023

Respectfully submitted,

/s/ Robert F. Muse___

Robert F. Muse
Rachel Clattenburg
Ronald Kovner
Levy Firestone Muse LLP
900 17th St. NW, Suite 1200
Washington, D.C. 20006
(202) 261-6564

*Counsel for Appellants*
*CCWB Asset Investments, LLC and*
*M.C. Dean, Inc.*

## STATEMENT REGARDING ORAL ARGUMENT

Appellants CCWB Asset Investments, LLC and M.C. Dean, Inc., respectfully request oral argument in this case.

## CERTIFICATE OF COMPLIANCE

I hereby certify pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) that the attached brief is proportionally spaced, has a typeface (Times New Roman) of 14 points, and contains 7,522 words (excluding, as permitted by Fed. R. App. P. 32(f), the cover page, table of contents, table of authorities, statement regarding oral argument, certificate of compliance, and signature block), as counted by the Microsoft Word processing system used to produce this brief.

Dated:   March 13, 2023

Respectfully submitted,

By:  /s/ Robert F. Muse___

Robert F. Muse

## CERTIFICATE OF SERVICE

I certify that on March 13, 2023, I electronically filed the foregoing using CM/ECF which sends a notice of the filing on all counsel of record.


By: /s/ Robert F. Muse____