No. 22-2256 (L), No. 22-2296 (CON)

In The

# United States Court of Appeals for the Fourth Circuit

CCWB Asset Investments, LLC; M.C. Dean, Inc.,

*Claimants-Appellants*,

EBC Asset Investment, LLC; Jeffrey J. Connaughton; Iwona Howley; Rich Castro; Tony Davis; Rochelle Katz; Barbara Louderback; Scott D. Oser; Ojas Patel; Pulin Patel; Dhavel Shukla; Nishant Shukla,

*Claimants*,

*(See inside cover for continuation of case caption)*

On Appeal from the United States District Court
for the District of Maryland at Baltimore, No. 1:18-cv-02844;
The Honorable Richard D. Bennett

## RECEIVER-APPELLEE'S RESPONSE BRIEF

Danny G. Solomon
  *Counsel of Record*
Husch Blackwell LLP
1801 Pennsylvania Ave., N.W.,
Suite 1000
Washington, DC 20006

Buffey E. Klein
Husch Blackwell LLP
1900 N. Pearl Street, Ste. 1800
Dallas, TX 75201

Lynn H. Butler
Jameson J. Watts
Husch Blackwell LLP
111 Congress Ave., Ste. 1400
Austin, TX 78701

*Counsel for Receiver-Appellee Gregory S. Milligan*

AND

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff*,

UNITED STATES OF AMERICA,

*Intervenor/Plaintiff*,

MASSACHUSETTS ATTORNEY GENERAL,

*Intervenor*,

v.

GREGORY S. MILLIGAN,

*Receiver-Appellee*,

RANDEL LEWIS,

*Receiver*,

AND

KEVIN B. MERRILL; JAY B. LEDFORD; CAMERON R. JEZIERSKI; GLOBAL CREDIT RECOVERY, LLC; DELMARVA CAPITAL, LLC; RHINO CAPITAL HOLDING, LLC; RHINO CAPITAL GROUP, LLC; DEVILLE ASSET MANAGEMENT LTD; RIVERWALK FINANCIAL CORPORATION; AMANDA MERRILL; LALAINE LEDFORD; MAUREEN STEPHENS; ERICKA JOHNSON,

*Defendants.*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _22-2256_      Caption: _CCWB Asset Investments, LLC v. Gregory Milligan_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Gregory S. Milligan, Receiver_
(name of party/amicus)

_____

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                      ☐YES ☑NO
     If yes, identify entity and nature of interest:


5.   Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:


6.   Does this case arise out of a bankruptcy proceeding?                      ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.


7.   Is this a criminal case in which there was an organizational victim?            ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.


Signature: Daniel G. Solomon                          Date:      12/13/2022

Counsel for: Gregory S. Milligan, Receiver

Print to PDF for Filing

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................... iii

INTRODUCTION ........................................................................1

JURISDICTIONAL STATEMENT ................................................ 2

STATEMENT OF ISSUES ...........................................................5

STATEMENT OF THE CASE .......................................................5

A.    The district court creates a receivership to marshal and distribute assets to defrauded investors.....................................................................5

B.    The Dean Investors object to their claims' treatment under the Rising Tide method ..........................................................................7

C.    The Connaughton Investors object to the distribution plan's collateral offset provision ............................................................. 9

SUMMARY OF THE ARGUMENT ................................................10

STANDARD OF REVIEW ..........................................................12

ARGUMENT...........................................................................13

I.    The district court did not abuse its discretion in rejecting the Dean Investors' proposed maximum balance approach.......................................14

    A.    Dictum in *SEC v. Huber* does not require the district court to apply the maximum balance approach...............................................14

    B.    Courts that have been asked to consider the maximum balance approach rejected it........................................................... 17

C.  Applying the maximum balance approach to the Dean Investors' claims would be administratively difficult and prone to inaccuracies ...................................................................... 21

D.  The Dean Investors benefitted from their Ponzi Scheme withdrawals ..............................................................................30

II.  The district court did not abuse its discretion in approving the distribution plan's collateral offset provision ............................................34

A.  Collateral offset provisions in receiverships help equalize investors' recoveries ....................................................... 34

B.  The collateral source rule and bankruptcy do not require ignoring collateral recoveries in receiverships ............................................... 37

C.  Collateral offset provisions need not discourage future receivership claimants from pursuing third-party litigation ............... 41

D.  Other distribution plans' collateral offset provisions do not help this Court in reviewing the district court for abuse of discretion ....... 45

CONCLUSION .................................................................................... 48

REQUEST FOR ORAL ARGUMENT ............................................................50

CERTIFICATE OF COMPLIANCE ................................................................ 51

CERTIFICATE OF SERVICE ..........................................................................52

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.*,
   139 F.3d 419 (4th Cir. 1998).................................................................. 8

*Biggs v. N.C. Dep't of Pub. Safety*,
   953 F.3d 236 (4th Cir. 2020)................................................................34

*Catlin v. United States*,
   324 U.S. 229 (1945) ............................................................................ 2

*CFTC v. Am. Commodity Grp. Corp.*,
   753 F.2d 862 (11th Cir. 1984).........................................................39-40

*CFTC v. Barki, LLC*,
   2009 WL 3839389 (W.D.N.C. Nov. 12, 2009)........................... 33, 46

*CFTC v. PrivateFX Glob. One*,
   778 F. Supp. 2d 775 (S.D. Tex. 2011).................................................46

*CFTC v. Rust Rare Coin, Inc.*,
   2020 WL 4904165 (D. Utah Aug. 20, 2020) .....................................30

*CFTC v. U.S. Ventures LC*,
   630 F. App'x 783 (10th Cir. 2015) .......................................................3

*CFTC v. Wilson*,
   2013 WL 3776902 (S.D. Cal. July 17, 2013)...................................... 6

*Chisholm v. UHP Projects, Inc.*,
   205 F.3d 731 (4th Cir. 2000)........................................................ 38, 39

*Cohen v. Beneficial Indus. Loan Corp.*,
   337 U.S. 541, (1949) ........................................................................... 2

*Cunningham v. Brown*,
    265 U.S. 1 (1924) ........................................................ 37

*Danner v. Int'l Freight Sys. of Wash., LLC*,
    855 F. Supp. 2d 433 (D. Md. 2012) .................................... 38

*Danner v. Int'l Freight Sys. of Wash., LLC*,
    2013 WL 78101 (D. Md. Jan. 04, 2013) ............................... 40

*Dewsnup v. Timm*,
    502 U.S. 410 (1992) ................................................ 40, 41

*Fawzy v. Wauquiez Boats SNC*,
    873 F.3d 451 (4th Cir. 2017) ............................................ 2

*Holland v. Florida*,
    560 U.S. 631 (2010) .................................................... 21

*Horwitt v. Flatiron Partners, LP*,
    2023 WL 192500 (2d Cir. Jan. 17, 2023) ..................... 18, 19, 20, 36

*In re Del Biaggio*,
    496 B.R. 600 (Bankr. N.D. Cal. 2012) ................................. 41

*In re Nat'l Energy & Gas Transmission, Inc.*,
    492 F.3d 297 (4th Cir. 2007) ........................................... 40

*In re Pressman-Gutman Co.*,
    459 F.3d 383 (3d Cir. 2006) ............................................. 4

*In re The Reserve Fund Sec. & Derivative Litig.*,
    673 F. Supp. 2d 182 (S.D.N.Y. 2009) .................................. 35

*In re The Vaughan Co., Realtors*,
    543 B.R. 325 (Bankr. D.N.M. 2015) .................................... 6

*Ivanhoe Building & Loan Ass'n of Newark v. Orr*,
    295 U.S. 243 (1935) .................................................... 40

*Kansas v. Nebraska,*
   574 U.S. 445 (2015) ...........................................................................46

*Leiba v. Holder,*
   699 F.3d 346 (4th Cir. 2012) ...........................................................16

*Liberte Cap. Grp., LLC v. Capwill,*
   248 F. App'x 650 (6th Cir. 2007) ...............................................40, 41

*Mohawk Indus., Inc. v. Carpenter,*
   558 U.S. 100 (2009)..........................................................................2

*Morris v. Wachovia Sec., Inc.,*
   448 F.3d 268 (4th Cir. 2006) ...........................................13, 32, 37, 46

*Netsphere, Inc. v. Baron,*
   799 F.3d 327 (5th Cir. 2015)..............................................................4

*Newport News Shipbuilding & Dry Dock Co. v. Holiday,*
   591 F.3d 219 (4th Cir. 2009) ...........................................................13

*Off. Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC,*
   467 F.3d 73 (2d Cir. 2006) ..............................................................37

*People v. Merkin,*
   194 A.D.3d 657, 150 N.Y.S.3d 45 (N.Y. App. Div.)............................35

*SEC v. An-Car Oil Co.,*
   604 F.2d 114 (1st Cir. 1979) ...........................................................48

*SEC v. Amerindo Inv. Advisors Inc.,*
   2014 WL 2112032 (S.D.N.Y. May 6, 2014), *aff'd sub nom. SEC v.*
   *Amerindo Inv. Advisors*, 639 F. App'x 752 (2d Cir. 2016)....................47

*SEC v. Basic Energy & Affiliated Res., Inc.,*
   273 F.3d 657 (6th Cir. 2001) .............................................................3

*SEC v. Byers,*
   637 F. Supp. 2d 166 (S.D.N.Y. 2009), *aff'd sub nom. SEC v. Malek*, 397 F.

App'x 711 (2d Cir. 2010), *and aff'd sub nom. SEC v. Orgel*, 407 F. App'x
504 (2d cir. 2010) ................................................................ 33, 41, 47

*SEC v. Callahan*,
193 F. Supp. 3d 177 (E.D.N.Y. 2016) ........................................... 6, 22

*SEC v. Cap. Consultants LLC*,
453 F.3d 1166 (9th Cir. 2006) ...................................................... 3

*SEC v. Cap. Consultants, LLC*,
397 F.3d 733 (9th Cir. 2005) ................................................ passim

*SEC v. Champion-Cain*,
2023 WL 2215955 (S.D. Cal. Feb. 24, 2023) .................................. 14

*SEC v. Coadum Advisors, Inc.*,
2009 WL 10664889 (N.D. Ga. Sept. 24, 2009) ........... 17, 18, 23, 31, 32

*SEC v. Credit Bancorp, Ltd.*,
290 F. Supp. 2d 418 (S.D.N.Y. 2003) ........................................ 37, 47

*SEC v. Credit Bancorp, Ltd.*,
290 F.3d 80 (2d Cir. 2002) .......................................................... 12

*SEC v. Credit Bancorp, Ltd.*,
2000 WL 1752979 (S.D.N.Y. Nov. 29, 2000) .................................. 26

*SEC v. Elliott*,
953 F.2d 1560 (11th Cir. 1992) ...................................................... 1

*SEC v. Enter. Tr. Co.*,
2008 WL 4534154 (N.D. Ill. Oct. 7, 2008) ................................. 21, 48

*SEC v. Enter. Tr. Co.*,
559 F.3d 649 (7th Cir. 2009) ...................................................... 41

*SEC v. Faulkner*,
2020 WL 2042339 (N.D. Tex. Apr. 28, 2020) ................................. 21

*SEC v. Forex Asset Mgmt. LLC*,
   242 F.3d 325 (5th Cir. 2001) ......................................................2, 3, 13

*SEC v. Hardy*,
   803 F.2d 1034 (9th Cir. 1986) .................................................... 12, 21

*SEC v. Huber*,
   702 F.3d 903 (7th Cir. 2012) .........................................................passim

*SEC v. Johnson*,
   43 F.4th 382 (4th Cir. 2022) ............................................................ 12

*SEC v. Malek*,
   397 F. App'x 711 (2d Cir. 2010) ...................................................... 41

*SEC v. McGinn, Smith & Co.*,
   2016 WL 6459795 (N.D.N.Y. Oct. 31, 2016)...............................passim

*SEC v. Morgan*,
   2020 WL 6536894 (W.D.N.Y. Nov. 6, 2020) ...................................26

*SEC v. Parish*,
   2010 WL 5394736 (D.S.C. Feb. 10, 2010) .................................passim

*SEC v. Quan*,
   870 F.3d 754 (8th Cir. 2017) ...................................................... 12, 47

*SEC v. Quan*,
   2015 WL 8328050 (D. Minn. Dec. 8, 2015), *aff'd*, 870 F.3d 754 (8th Cir.
   2017) ............................................................................................. 47

*SEC v. Todays Growth Consultant Inc.*,
   2020 WL 7027724 (N.D. Ill. Nov. 30, 2020) ...................................39

*SEC v. Torchia*,
   922 F.3d 1307 (11th Cir. 2019) .................................................. 3, 13

*SEC v. Varacchi*,
   2021 WL 10361074 (D. Conn. July 30, 2021), *aff'd sub nom.*

*Horwitt v. Flatiron Partners, LP*,
   2023 WL 192500 (2d Cir. Jan. 17, 2023) ................................................ 18, 23, 28

*SEC v. Vescor Cap. Corp.*,
   599 F.3d 1189 (10th Cir. 2010) ........................................................... 13

*SEC v. Wang*,
   944 F.2d 80 (2d Cir. 1991) ...............................................35, 36, 46

*SEC v. Wealth Mgmt. LLC*,
   628 F.3d 323 (7th Cir. 2010) ......................................................passim

*Shuler v. City of L.A.*,
   849 F. App'x 671 (9th Cir. 2021) .................................................... 20

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
   988 F.3d 690 (4th Cir. 2021) ............................................................ 8

*Swint v. Chambers Cnty. Comm'n*,
   514 U.S. 35 (1995) ........................................................................... 2

*Tate v. Showboat Marina Casino P'ship*,
   431 F.3d 580 (7th Cir. 2005) .......................................................... 15

*United States v. Berry*,
   845 F. App'x 915 (11th Cir. 2021) ................................................. 20

*United States v. Durham*,
   86 F.3d 70 (5th Cir. 1996) .............................................................. 21

*United States v. Lazo*,
   816 F. App'x 752 (4th Cir. 2020) ................................................... 16

*United States v. Pasquantino*,
   336 F.3d 321 (4th Cir. 2003), *aff'd*, 544 U.S. 349 (2005) ..............15, 16

*United States v. Solco I, LLC*,
   962 F.3d 1244 (10th Cir. 2020) ........................................................ 4

viii

*United States v. Thornsbury*,
670 F.3d 532 (4th Cir. 2012) ............................................................ 20

*Vercon Const., Inc. v. Highland Mortg. Co.*,
2005 WL 6158875 (D.S.C. July 21, 2005), *aff'd*, 187 F. App'x 364 (4th Cir. 2006) ...................................................................................... 40

*Walters v. Edgar*,
163 F.3d 430 (7th Cir. 1998) ............................................................ 16

*Ward v. Allied Van Lines, Inc.*,
231 F.3d 135 (4th Cir. 2000) ............................................................ 38

*Wells, Waters & Gases, Inc. v. Air Prod. & Chemicals, Inc.*,
19 F.3d 157 (4th Cir. 1994) ............................................................. 17

*Wilder v. Apfel*,
153 F.3d 799 (7th Cir. 1998) ...................................................... 16, 32

*Wilson v. UnitedHealthcare Ins. Co.*,
27 F.4th 228 (4th Cir. 2022) ....................................................... 12, 13

## Statutes and Other Authorities

28 U.S.C. § 1291 ............................................................................... 2

28 U.S.C. § 1292(a)(2) ....................................................................... 4

Black's Law Dictionary (11ᵗʰ ed. 2019) ............................................. 15

Richard A. Posner, *The Problems of Jurisprudence* (1990) ..................... 17

## INTRODUCTION

When a Ponzi scheme crumbles, nobody wins. This appeal is about the inevitably imperfect attempt to pick up the pieces. Charged with preserving and marshaling assets to maximize defrauded investors' recoveries, Receiver Gregory Milligan crafted a fair and reasonable distribution plan. No, not perfect. At least if you asked each investor. After all, "each investor's recovery comes at the expense of the others." *SEC v. Wealth Mgmt. LLC*, 628 F.3d 323, 336 (7th Cir. 2010) (citation omitted). But it provided the greatest recovery for the most investors. The district court, exercising its "broad powers and wide discretion to determine relief," agreed. *SEC v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992).

For all that, Appellants clamor that the Receiver's distribution plan is unfair to them. The Dean Investors would have the Receiver apply a novel, unworkable approach to the Rising Tide distribution method, originating in dictum from an out-of-circuit case. For their part, the Connaughton Investors challenge the Receiver's collateral offset provision, which ensures that investors who recouped investment losses from third parties do not realize a disproportionate recovery. In short, Appellants seek bigger pieces of the pie.

In challenging the district court's supervisory authority over an equitable receivership, Appellants face an unenviable climb. They must show that the district court abused its discretion in a context that grants broad discretion to approve imperfect solutions. Because Appellants do not come close to meeting this heavy burden, this Court should affirm the district court's order.

## JURISDICTIONAL STATEMENT

Under 28 U.S.C. § 1291, this Court has jurisdiction over "all final decisions of the district courts of the United States." A final decision "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Fawzy v. Wauquiez Boats SNC*, 873 F.3d 451, 454 (4th Cir. 2017) (quoting *Catlin v. United States*, 324 U.S. 229, 233 (1945)); *see also Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995) (describing a final decision as one "by which a district court disassociates itself from a case"). With no analysis, Appellants CCWB Asset Investments, LLC and M.C. Dean, Inc. contend that the district court's order overruling objections to the Receiver's Motion for Order Approving Distribution Plan and Interim Distribution is a final decision under 28 U.S.C. § 1291. Doc. 31 ("Dean Br.") at 1; *see* JA568. This order neither ended the litigation on the merits nor left nothing for the court to do but execute the judgment. Thus, the district court's order is not a final decision under § 1291. *See SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 330 (5th Cir. 2001) (holding that an order approving a distribution plan in a civil enforcement action is not a final decision under § 1291); *accord Wealth Mgmt.*, 628 F.3d at 330.

Rather, this Court has jurisdiction under the collateral order doctrine. *See* Doc. 50 ("Connaughton Br.") at 1. Section § 1291 also confers on this Court jurisdiction to review "a small set of prejudgment orders that are 'collateral to' the merits of an action and 'too important' to be denied immediate review." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, (1949)). "That small category includes only decisions [1] that

are conclusive, [2] that resolve important questions separate from the merits, and [3] that are effectively unreviewable on appeal from the final judgment in the underlying action." *Id.* (citation omitted).

At least four circuits have held that an order overruling claimants' objections and approving a distribution plan in a civil enforcement action is immediately appealable under the collateral order doctrine. *Forex Asset Mgmt.*, 242 F.3d at 330–31; *SEC v. Torchia*, 922 F.3d 1307, 1315 (11th Cir. 2019); *Wealth Mgmt.*, 628 F.3d at 330–31; *SEC v. Basic Energy & Affiliated Res., Inc.*, 273 F.3d 657, 666–67 (6th Cir. 2001); *see also CFTC v. U.S. Ventures LC*, 630 F. App'x 783, 785–86 (10th Cir. 2015); *but see SEC v. Cap. Consultants LLC*, 453 F.3d 1166, 1171–72 (9th Cir. 2006) (per curiam) (holding that the collateral order doctrine does not apply because investors' claims to receiver-held assets are not collateral to the action's merits).

The district court's order overruling Appellants' objections and approving the Receiver's distribution plan easily satisfies all three criteria. *First*, the order determines the disputed question—how the receiver should distribute receivership assets. *Forex*, 242 F.3d at 330. *Second*, asset distribution is important to defrauded investors and independent of the Securities and Exchange Commission's enforcement action's merits. *Id. Third*, the order is effectively unreviewable because the assets need to be distributed "long before the action brought by the SEC is subject to appellate review." *Id.* In short, interlocutory review "makes sense out of fairness to the investors and as a matter of judicial economy." *Wealth Mgmt.*, 628 F.3d at 330–31. This Court thus has appellate jurisdiction under the collateral order doctrine.

Appellants Jeffrey J. Connaughton, Tony Davis, Rochelle Katz, Barbara Louderback, Scott Oser, Ojas Patel, Pulin Patel, Dhavel Shukla, and Nishant Shukla's ("Connaughton Investors") also suggest that this Court has jurisdiction under 28 U.S.C. § 1292(a)(2) because "this is an appeal from an order 'tak[ing] steps to accomplish the purposes' of a receivership." Connaughton Br. 1. Section 1292(a)(2) grants this Court jurisdiction over "[i]nterlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property." Courts "narrowly construe" § 1292(a)(2) "to permit appeals only from the three discrete categories of receivership orders specified in the statute": "[1] orders appointing a receiver, [2] orders refusing to wind up a receivership, and [3] orders refusing to take steps to accomplish the purposes of winding up a receivership." *United States v. Solco I, LLC*, 962 F.3d 1244, 1250 (10th Cir. 2020) (quoting *In re Pressman-Gutman Co.*, 459 F.3d 383, 393 (3d Cir. 2006)); *see also Netsphere, Inc. v. Baron*, 799 F.3d 327, 331–32 (5th Cir. 2015) (explaining that every circuit to discuss the issue has held § 1292(a)(2)'s "refusing orders" also modifies "to take steps to accomplish the purposes thereof" (cleaned up)). The district court's order does not fall into these discrete categories of receivership orders that may be appealed under § 1292(a)(2).

4

## STATEMENT OF ISSUES

1.      Whether the district court abused its discretion when it declined to apply the novel maximum balance approach to the Dean Investors' claims under the Rising Tide distribution method.

2.      Whether the district court abused its discretion in approving the distribution plan's collateral offset provision for third-party recoveries to equalize claimants' recoveries.

## STATEMENT OF THE CASE

### A.    The district court creates a receivership to marshal and distribute assets to defrauded investors.

Defendants Kevin B. Merrill, Jay B. Ledford, and Cameron Jezierski raised more than $345 million from over 230 investors in a Ponzi scheme to buy and sell fraudulent consumer debt portfolios. JA53. Apart from criminal proceedings, the SEC brought a civil action against the Defendants and related entities ("Receivership Parties") for securities violations. *See generally* JA211 (listing the Receivership Parties). During this action, the district court appointed the Receiver to marshal and distribute assets to swindled investors. JA104. Following a thorough claims submission process, the Receiver recognized 238 claims totaling $166,022,249.09 against the receivership estate. JA214. After identifying, marketing, and selling assets, the Receiver moved the district court to approve a distribution plan that created a claimant hierarchy and proposed a $50 million interim distribution. JA210–233.

To distribute assets to Appellants' investor class (Class 4), the Receiver chose the Rising Tide method, the "most commonly used (and judicially approved)

method for apportioning receivership assets." *SEC v. Huber*, 702 F.3d 903, 906 (7th Cir. 2012) (Posner, J.) (collecting cases). Under the Rising Tide method, the Receiver's asset distribution is calculated so that no claimant recovers less than a certain minimum percentage recovery of their total investment, called the tide. *In re The Vaughan Co., Realtors*, 543 B.R. 325, 331 (Bankr. D.N.M. 2015).

When calculating an investor's total investment loss, "withdrawals [from the Ponzi scheme] are considered part of the distribution received by an investor and so are subtracted from the amount of the receivership assets to which he would be entitled had there been no withdrawals." *Huber*, 702 F.3d at 905; *see also CFTC v. Wilson*, 2013 WL 3776902, at *3 (S.D. Cal. July 17, 2013) ("The basic rising tide formula is as follows: ((actual dollars invested) x (pro rata multiplier))—withdrawals previously received."). This treatment "prevents an investor who previously received funds as a withdrawal from benefitting at the expense of other investors in the scheme who did not receive any withdrawals . . . ." *SEC v. Callahan*, 193 F. Supp. 3d 177, 199 (E.D.N.Y. 2016). In effect, "investors who received prior payments are entitled to receive a smaller pro-rata payment from the receivership estate than those who received no prior payment." *SEC v. Parish*, 2010 WL 5394736, at *3 (D.S.C. Feb. 10, 2010). On the other hand, "investors who previously received payments exceeding their pro rata amount of the total distribution will receive no distribution from the receivership estate." *Id.*

6

**B.    The Dean Investors object to their claims' treatment under the Rising Tide method.**

CCWB; EBC Asset Investment, LLC; and M.C. Dean (collectively, the "Dean Investors"), three entities affiliated with the same Dean family of Virginia, were big investors in the Ponzi scheme. *See* JA486–487, JA517 ("CCWB and ECB, are two of the top five volume distribution receivers."). CCWB invested $22,273,700.48 with the Receivership Parties and received $11,446,943.17 in distributions; EBC invested $19,875,917.11 and received $11,945,618.76; and M.C. Dean invested $13,925,173 and received $2,427,039. JA352–353. Using these numbers, the Receiver calculated the Dean Investors' Current Recovery, each claimant's pre-receivership percentage recovery, at 51.39%, 60.1%, and 17.43%. JA246–248.[1] Because the distribution plan set a 48.86% tide, the Receiver proposed distributing $4,736,833 to M.C. Dean to bring M.C. Dean's recovery up to the tide. JA243, JA246. On the other hand, CCWB and EBC would receive no first-round distribution because they had recovered over 48.86% of their total investment. JA247–248, JA352–353.

Though CCWB, EBC, and M.C. Dean did not challenge the Rising Tide method generally, they asserted that the Receiver miscalculated their Current Recoveries under the Rising Tide method because they reinvested all but $273,862, $498,034, and $50,000, respectively, after receiving Ponzi scheme distributions. JA252–254. Rather than treating all withdrawals as pre-receivership recoveries, which decreases the receivership distribution, the Dean Investors advocated for applying a "maximum balance" approach to the Rising Tide method, which ignores

---

[1] Investor codes I-0019, I-0021, and I-0022 correspond to CCWB, EBC, and M.C. Dean. JA335, JA341, JA347.

reinvested withdrawals and treats the maximum balance in a Ponzi scheme as the total investment. JA256–257; *see Huber*, 702 F.3d at 907. Using this approach, the Dean Investors first calculated their Current Recovery at 2.5%, 5.9%, and 0.04%,[2] yielding $5,149,780 to CCWB, $3,620,000 to EBC, and $5,592,418 to M.C. Dean— $9,985,365 more than the Dean Investors would receive under the distribution plan. JA276.

The district court overruled the Dean Investors' objection, declining to apply the maximum balance approach for three reasons. *First*, no court had ever applied the maximum balance approach. JA573. *Second*, identifying and tracing withdrawals and reinvestments would be an impracticable administrative nightmare. *Id. Third*, "however big or small," the Dean Investors benefited from their Ponzi scheme withdrawals. *Id.* This appeal follows.

Before briefing, EBC voluntarily dismissed itself from this appeal. Doc. 25. Now, CCWB and M.C. Dean use this dismissal to mask EBC's presence below. *See infra* at 23–24, 29 n.10 & 30 (explaining that EBC's transactions were the most complex and EBC benefitted the most from investing in the Ponzi scheme). That is not how appellate review works. Dismissed or not, this Court "review[s] the district court's analysis based on the facts that were before it." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 715 n.12 (4th Cir. 2021); *see, e.g., Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.*, 139 F.3d 419, 423 n.25 (4th Cir. 1998) (reviewing the district court's decision based on "the situation that confronted it at the time it made [its]

---

[2] The Dean Investors changed their Current Recovery calculations two more times in the district court. *See infra* at 28–29.

decision"). Because the district court considered the Dean Investors' objections to-gether, *see* JA249, JA436, JA569, this Court cannot review the district court's order for abuse of discretion without doing the same. Put another way, dismissing EBC from the appeal does not chisel out EBC from the record below.

## C. The Connaughton Investors object to the distribution plan's collateral offset provision.

The Connaughton Investors objected to the distribution plan on other grounds. Thirty-eight claimants received $2,882,787.66 from non-Receivership Par-ties to compensate for their investment losses. JA220–221. The Receiver treated these third-party recoveries as pre-receivership withdrawals to equalize the recovery among investors. JA221. In other words, when calculating a claimant's Current Re-covery for the Rising Tide analysis, the Receiver counted third-party payments as recovered losses.

The Connaughton Investors are nine of fifteen investors who invested in the Receivership Parties through the "Bethesda Group," a feeder fund that allegedly made fraudulent misrepresentations to induce investments with the Receivership Parties. JA85–88. These fifteen investors, the "Connaughton Plaintiffs," settled a lawsuit against the Bethesda Group's organizers for ████. JA277–278, SA65. After deducting ████ in costs and attorneys' fees, the Connaughton Plaintiffs recovered ████ to compensate them for their investment losses. *Id.* When factoring in the Bethesda Group settlement (after subtracting costs and attorney's fees), the Connaughton Plaintiffs realized a 57.72% average Current Recovery. SA3. Under the distribution plan's initial 48.86% tide, eight Connaughton Plaintiffs would

receive no first distribution. JA247–248. The Connaughton Plaintiffs would, how-ever, receive later distributions as the tide increased. SA6.

Of the thirty-eight claimants who received third-party recoveries, only the nine Connaughton Investors objected to the distribution plan's treatment of third-party recoveries. JA277–288. They argued that the Receiver should ignore third-party recoveries under the collateral source rule from tort law. JA279–280. Ignoring third-party recoveries, they said, would reward them for their initiative to recover assets from non-receivership sources and encourage future claimants to pursue third-party recoveries. *Id.* At the least, the Connaughton Investors argued that the district court should change the distribution plan's collateral offset to something "less draconian." JA283–288. The district court disagreed. It overruled the Con-naughton Investors' objection because under their proposed calculation, they would receive "a disproportionately higher recovery on their investment" than other in-vestors. JA574. This appeal follows.

## SUMMARY OF THE ARGUMENT

Both the Dean Investors' and Connaughton Investors' objections to the dis-tribution plan miss the mark. First, the district court did not abuse its discretion when it rejected the Dean Investors' alternative claim calculation using the maxi-mum balance approach. This approach, borrowed from dictum in a Seventh Circuit opinion, has never been applied in a Rising Tide distribution plan. If nothing else, this lack of precedent supports the district court's discretionary decision. But more

than that, the only two courts that appear to have considered the maximum balance approach in a distribution plan, rejected it as inequitable.

On top of this, even if the maximum balance approach had some precedential value, applying it here would be prohibitively difficult and inaccurate. The maximum balance approach contemplates an investor withdrawing money from a Ponzi scheme and reinvesting the same funds immediately. The Dean Investors did anything but. After withdrawing money from the Ponzi scheme, the Dean Investors waited months to invest money back into the Ponzi scheme. Between these withdrawals and later investments, the Dean Investors used the same bank accounts to transact with non-Receivership Parties, disbursing millions for personal use and depositing millions in new money into their accounts. Given this complicated transaction history, the Receiver could not apply the maximum balance approach here. Aside from the maximum balance approach's administrative difficulty, adopting this approach would unfairly overlook the benefit that the Dean Investors enjoyed from withdrawing Ponzi scheme funds.

The Connaughton Investors' objection fares no better. Far from an abuse of discretion, courts routinely approve collateral offset provisions in equitable receiverships to avoid some investors' disproportionate recovery. Indeed, if the Receiver had ignored the Connaughton Investors' Bethesda Group settlement, they would recover a substantially higher percentage of their investment while other investors recovered less. Though offsetting collateral recoveries is appropriate generally, offsetting the Connaughton Investors' collateral recovery is particularly important here because the Bethesda Group's organizers, net winners from the Ponzi scheme, held

11

assets that belonged to the receivership. Finally, the collateral offset provision need not discourage future receivership claimants from pursuing third-party recoveries. As the Connaughton Investors do here, investors can recover more money faster seeking collateral recoveries than leaving their fate to a receiver's distribution. This Court should affirm the district court's order overruling the objections to the distribution plan.

## STANDARD OF REVIEW

A district court has "broad equitable power" in supervising an equity receivership, "so appellate scrutiny is narrow." *Wealth Mgmt.*, 628 F.3d at 332; *accord, e.g.*, *SEC v. Cap. Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005) (describing a district court's power to shape an equity receivership as "extremely broad"). The district court deserves this "broad deference" because "most receiverships involve multiple parties and complex transactions." *SEC v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986). Courts of Appeal thus review a "district court's selection of a distribution plan for the receivership assets for abuse of discretion." *SEC v. Quan*, 870 F.3d 754, 762 (8th Cir. 2017) (citing *Wealth Mgmt.*, 628 F.3d at 332–33 and *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 87 (2d Cir. 2002)).

Appellants' burden to show that the district court abused its discretion "necessarily is a heavy one." *SEC v. Johnson*, 43 F.4th 382, 393 (4th Cir. 2022). A district court "abuses its discretion when it acts arbitrarily or irrationally, fails to consider judicially recognized factors constraining its exercise of discretion, relies on erroneous factual or legal premises, or commits an error of law." *Wilson v. UnitedHealthcare*

12

*Ins. Co.*, 27 F.4th 228, 242 (4th Cir. 2022) (quoting *Newport News Shipbuilding & Dry Dock Co. v. Holiday*, 591 F.3d 219, 226–27 (4th Cir. 2009)). This Court does not "ask whether [it] would have come to the same conclusion as the district court if [it] were examining the matter *de novo*." *Morris v. Wachovia Sec., Inc.*, 448 F.3d 268, 277 (4th Cir. 2006). Rather, this Court reverses for abuse of discretion only if it forms "a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Id.* (citation omitted).

## ARGUMENT

An equitable receivership's primary goal is to "grant fair relief to as many investors as possible." *Torchia*, 922 F.3d at 1311. In turn, the district court's "primary job" in supervising a receivership is "to ensure that the proposed plan of distribution is fair and reasonable." *Wealth Mgmt.*, 628 F.3d at 332. To that end, the district court need only "use[] its discretion in a logical way to divide the money." *Forex*, 242 F.3d at 331. Though the Dean Investors and the Connaughton Investors contend that the plan is unfair to them, their clamoring does not morph the district court's approval into an abuse of discretion. Simply put, "[a]n equitable plan is not necessarily a plan that everyone will like." *SEC v. Vescor Cap. Corp.*, 599 F.3d 1189, 1195 (10th Cir. 2010) (citation omitted). Affording the district court broad deference, this Court should affirm the district court's order.

13

I.     **The district court did not abuse its discretion in rejecting the Dean Investors' proposed maximum balance approach.**

The district court did not abuse its "broad equitable power" in supervising an equity receivership when it rejected the Dean Investors' maximum balance approach. *Wealth Mgmt.*, 628 F.3d at 332. The Seventh Circuit's discussion on the approach is dictum, it would be administratively difficult to apply, and the Dean Investors benefited from participating in the Ponzi scheme. These reasons independently support the district court's discretionary ruling. This Court should affirm.

A.     **Dictum in *SEC v. Huber* does not require the district court to apply the maximum balance approach.**

The district court approved the distribution plan's Rising Tide method, the "most commonly used (and judicially approved) method for apportioning receivership assets." *Huber*, 702 F.3d at 906; *see SEC v. Champion-Cain*, 2023 WL 2215955, at *9 (S.D. Cal. Feb. 24, 2023) ("The Rising Tide method is widely endorsed as the most commonly used and equitable method for distributing receivership assets in fraud cases.").[3] As in most receiverships, using the Rising Tide method here afforded the greatest recovery for the most investors. JA252–253.

Although the Dean Investors do not challenge the Rising Tide method generally, they contend that the district court abused its discretion in refusing to give their claims special treatment using a "maximum balance" approach mentioned in *SEC v. Huber*, a Seventh Circuit opinion written by Judge Richard Posner. *Huber* noted in

---

[3] Nothing is "iron[ic]" about relying on *Huber*, a seminal case on the Rising Tide method, for its holding while ignoring its hypothetical dictum on the maximum balance approach. Dean Br. 15; *see* JA226–228.

dictum that "[w]e are given pause" by how the Rising Tide method treats investors who reinvest withdrawals. 702 F.3d at 906–07. In a hypothetical when an investor reinvests money into a Ponzi scheme "shortly after withdrawing" it, *Huber* suggested that a receiver might apply a "maximum balance" approach. *Id.* at 907–08. Under this approach, the maximum balance in a Ponzi scheme "should be treated as his investment; the withdrawals, having in effect been rescinded, should be ignored." *Id.* at 907. In the end, the court resigned, "[o]r so it seems to us; we can't find any discussion in case law or commentary of this 'maximum balance' approach. We needn't pursue the issue. . . . [The claimant] has given no details and neither he nor any of the other appellants ask us to adopt the maximum-balance approach . . . ." *Id.*

The district court did not abuse its discretion when it declined to apply the maximum balance approach. In the first place, because the Rising Tide method is the most equitable method for distributing receivership assets, approving its straightforward, uniform application cannot be an abuse of discretion. But more to the point, the "concerns and potential solutions explained in *Huber* about reinvestments are dicta." JA573. Dictum is "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential." Black's Law Dictionary (11th ed. 2019); *see Tate v. Showboat Marina Casino P'ship*, 431 F.3d 580, 582 (7th Cir. 2005) (Posner, J.) (describing dicta as "things the court said, not what it held"). This Court has long held that "pure and simple dicta . . . cannot serve as a source of binding authority in American jurisprudence." *United States v. Pasquantino*, 336 F.3d 321, 329 (4th Cir. 2003) (en banc),

*aff'd*, 544 U.S. 349 (2005) (collecting Supreme Court cases). Even dicta from this Court's previous opinions are "non-binding" on later panels. *Leiba v. Holder*, 699 F.3d 346, 352 (4th Cir. 2012); *see, e.g.*, *United States v. Lazo*, 816 F. App'x 752, 766–67 (4th Cir. 2020).

Why are dicta not binding? Judge Posner explained. *First*, "not being integral elements of the analysis underlying the decision—not being grounded in a concrete legal dispute and anchored by the particular facts of that dispute—they may not express the judges' most careful, focused thinking." *Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998) (Posner, J.); *but cf.* Dean Br. 24 ("Judge Posner knew that the reinvested funds were not in play in *Huber* but was speaking to another day when the problem he anticipated would become reality . . . ."). *Second*, "to give the inessential parts of an opinion the force of law would give judges too much power, and of an essentially legislative character." *Wilder*, 153 F.3d at 803; *see Walters v. Edgar*, 163 F.3d 430, 433 (7th Cir. 1998) (Posner, J.) (treating dicta as "authoritative . . . is inconsistent with fundamental principles governing federal jurisdiction"). In sum, "adher[ing] to" dicta, Dean Br. 3, is the "significant problem," not the other way around. *Pasquantino*, 336 F.3d at 329.

Judge Posner's musings on the Rising Tide method—which do not express his "most careful, focused thinking," *Wilder*, 153 F.3d at 803—were thus not binding on the district court or any court for that matter. The district court never mistakenly held that it *could not* rely on *Huber* "because it is dicta," Dean Br. 22; it held only that it *need not* rely on it for the same reason. JA572–573. At bottom, declining to apply dictum from an out-of-circuit case—let alone dictum on a novel approach

16

that has "not been adopted by any other court to date"—is not an abuse of discretion. JA573.

No doubt dicta can be persuasive or helpful. As the Dean Investors point out, once almost thirty years ago, this Court used dictum from another well-reasoned Judge Posner opinion to guide its independent analysis.[4] *See Wells, Waters & Gases, Inc. v. Air Prod. & Chemicals, Inc.*, 19 F.3d 157, 161–63 (4th Cir. 1994) ("agree[ing] with the conclusion of the Seventh Circuit" after rehashing Judge Posner's thorough analysis). Even still, dicta's occasional use does not compel the finding that the district court abused its discretion in not heeding it here.

## B.    Courts that have been asked to consider the maximum balance approach rejected it.

Although no court has applied *Huber*'s dictum on the maximum balance approach, two courts have rejected it. *Contra* Dean Br. 23 (claiming that no court has "rejected" the maximum balance approach). First, in *SEC v. Coadum Advisors, Inc.*, a pre-*Huber* case, receivership claimants argued that "it would be inequitable for the Receiver" to treat reinvested withdrawals "as pre-receivership withdrawals for purposes of implementing the Rising Tide method." 2009 WL 10664889, at *7 (N.D. Ga. Sept. 24, 2009). The court rejected their argument, reasoning that for investors

---

[4] The Dean investors' cherry-picked "academic" approach does not, however, support "the values and uses of dicta." Dean Br. 24 n.11. In Judge Posner's book, The Problems of Jurisprudence, he discussed the merits of using "academic or other extrajudicial texts," not dicta. *See* Richard A. Posner, *The Problems of Jurisprudence* 95 (1990) ("I am not arguing that *academic or other extrajudicial texts* should have the same authority that judicial decisions have. . . . I am arguing only that when there is no holding, when there are only dicta, their weight ought to be determined by their intrinsic merit rather than by their official source.") (emphasis added).

who received withdrawals "to spend as they wished," "regardless of how they spent or reinvested those withdrawals"—even if they "quickly reinvested those funds"— "it would be inequitable to permit those investors to participate in distributions of recovered Coadum funds without first giving priority to the majority of Coadum investors who never received any of their invested Coadum funds." *Id.* at \*7–\*8.

Then, in *SEC v. Varacchi*, Flatiron Partners challenged the receiver's claim calculation under the distribution plan. 2021 WL 10361074, at \*1 (D. Conn. July 30, 2021), *aff'd sub nom. Horwitt v. Flatiron Partners, LP*, 2023 WL 192500 (2d Cir. Jan. 17, 2023). Flatiron invested an initial $2 million into a Ponzi scheme. *Id.* at \*3. A month later, Flatiron withdrew its $2 million investment for administrative purposes. *Id.* at \*4. Just four days later, Flatiron invested the $2 million back into the Ponzi scheme. *Id.*

Flatiron and the receiver disputed these three transactions' treatment. The receiver treated the three $2 million transactions as separate transactions—$2 million invested, $2 million disbursed, and $2 million invested. *Id.* at \*11. Using the Rising Tide method, the receiver calculated Flatiron's pre-receivership recovery as 43.06% ($3,057,931 recovered ÷ $7,100,921 invested). *Id.* On the other hand, Flatiron argued that "the Receiver's accounting reflects an extra $2 million in contributions and $2 million in distributions, effectively double-counting the $2 million sum." *Id.* (cleaned up). In other words, the receiver's "strict calculation of money in and money out" "inflat[ed] Flatiron's contributions and pre-receivership distributions." *Id.* at \*11–\*12; *cf.* Dean Br. 7 (arguing that "[t]he effect of the Receiver's method of calculation was to inflate the Current Recovery percentage"). When

"removed from both sides of the ledger," Flatiron argued for a 20.74% pre-receivership recovery ($1,057,931 ÷ $5,100,921)—less than half the receiver's percentage. *Id.*

The district court rejected Flatiron's argument, which "relie[d] in significant part" on *Huber*'s maximum balance approach. *Id.* at *11. *Huber*'s "dicta" was not "persuasive" because Flatiron did not "identif[y] any court, in this Circuit or elsewhere, that has endorsed or adopted the 'maximum balance' approach set forth in *Huber* in the nine years since that decision." *Id.* at *12; *accord* JA573 ("[T]he Virginia Group's proposed calculations under this 'maximum balance' approach have not been adopted by any other court to date."). The *Varacchi* court did not stop there. It noted that *Huber*'s discussion of the maximum balance approach is "dictum so peripheral to the holding that, even if the case were to have arisen in the Second Circuit, it would not be binding on this Court." *Id.* at *12 n.10. In the end, the district court agreed that the receiver correctly calculated Flatiron's pre-receivership recovery under the Rising Tide method. *Id.* at *14.

The Second Circuit affirmed. In *Horwitt v. Flatiron Partners, LP*, the court held that the district court did not "make an erroneous finding of fact" in treating each $2 million transfer distinctly" rather than "as a single $2 million investment."[5]

---

[5] Too focused on labels, the Dean Investors mistake Flatiron's argument on appeal. *See* Dean Br. 23 n.10. Flatiron argued that the receiver should ignore the $2 million "distribution and reinvestment" because the three transactions were "a single $2 million investment, rather than as a series of transfers." *Horwitt*, 2023 WL 192500, at *2. The Dean Investors assert the same thing: "[W]ithdrawn and reinvested funds should be ignored and should not count against the investor's distribution." Dean Br. 3.

2023 WL 192500, at *2 (2d Cir. Jan. 17, 2023). The receiver "simply applied the Rising Tide method," which requires treating all money in and out as investments and distributions. *Id.* Although the Second Circuit did not cite *Huber*, the parties briefed it extensively. *Compare Horwitt*, 2023 WL 192500, Doc. Nos. 75, 89, and 100, *with* Dean Br. 23 & 23 n.10 (trying to distinguish *Horwitt* because it did not cite *Huber* and claiming that "no federal appellate court appears to have addressed" *Huber*'s approach).

Last, the Dean Investors' argument on precedent similarly misses the mark. The district court did not "rely[] *too much* on precedent"—no precedent exists. Dean Br. 22 (emphasis added); *see also* JA511 (criticizing the Receiver for having a "cavalier attitude about the concept of precedent"). In the same way, lack of precedent did not "prevent[]" the district court from applying *Huber*; lack of precedent discouraged it. Dean Br. 23. This Court often rejects nonprecedential arguments, and the district court may do the same. *See, e.g.*, *United States v. Thornsbury*, 670 F.3d 532, 538 (4th Cir. 2012) (rejecting premise that "finds no support in precedent"). Indeed, courts hesitate to find an abuse of discretion absent binding precedent holding otherwise. *See, e.g.*, *United States v. Berry*, 845 F. App'x 915, 916 (11th Cir. 2021) ("Given the lack of binding precedent, we cannot say that the district court's failure to discuss and consider those factors constitutes an abuse of discretion."); *Shuler v. City of L.A.*, 849 F. App'x 671, 673 (9th Cir. 2021) (rejecting evidentiary argument that "finds no support in any precedent and, thus, does not provide a basis for us to conclude that the district court abused its discretion").

To sum up, that the district court could have applied the maximum balance approach does not mean it should have applied it. After all, district courts are "not bound to follow any particular plan or method of distribution simply because it is 'permissible under the circumstances.'" *SEC v. Faulkner*, 2020 WL 2042339, at *5 (N.D. Tex. Apr. 28, 2020) (quoting *United States v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996)); *see also SEC v. Enter. Tr. Co.*, 2008 WL 4534154, *3 (N.D. Ill. Oct. 7, 2008) ("There are no hard rules governing a district court's decisions in matters like these."). Even if Judge Posner were right in the abstract—to be sure, the maximum balance approach has some intuitive appeal—courts must evaluate equity "on a case-by-case basis." *Holland v. Florida*, 560 U.S. 631, 649–50 (2010) (citation omitted). Given the facts at hand, the district court did not abuse its discretion in rejecting the maximum balance approach here.

## C.   Applying the maximum balance approach to the Dean Investors' claims would be administratively difficult and prone to inaccuracies.

The district court did not rely on an incorrect factual or legal premise in finding that applying the maximum balance approach to the Dean Investors' claims would be administratively difficult and prone to inaccuracies. JA573. For one, a district court may consider administrative burden in approving a distribution plan. An equitable receivership's "primary purpose" is "to promote orderly and efficient administration of the estate . . . for the benefit of creditors." *Hardy*, 803 F.2d at 1038. With that in mind, "[r]eceivers have a duty to avoid overly costly investigations, and at a certain point, the costs of such individualized determinations outweigh the

benefits." *Wealth Mgmt.*, 628 F.3d at 336 ("Investigating individual claims is expensive and . . . would drain the receivership estate."); *see also* JA324 (using the maximum balance approach would "drain the estate of its limited resources"). For this reason, courts routinely affirm discretionary rulings that reject unwieldy administrative burdens. *See, e.g.*, *Wealth Mgmt.*, 628 F.3d at 336 (concluding that the district court acted within its discretion "to reject a case-by-case determination as too costly and time consuming"); *Cap. Consultants*, 397 F.3d at 745 (finding that district court acted within its discretion to overrule objection that would have imposed "a massive new administrative burden on the receiver," one he described as "Herculean").

The maximum balance approach contemplates a scenario when an investor "having withdrawn some money from the Ponzi scheme then reinvests it"—"it" referring to the money he withdrew. *Huber*, 702 F.3d at 907. *Huber* explained: "Suppose he had initially invested $150,000 and then, shortly after withdrawing $50,000, he reinvested it, thus restoring his balance to $150,000 . . . ." *Id.* In this case, "the investor's maximum balance in the Ponzi scheme ($150,000 in our example) should be treated as his investment; the withdrawals, having in effect been rescinded, should be ignored." *Id.* Applying the maximum balance approach thus requires the assurance that the investor reinvests the earlier withdrawals rather than new money into the scheme. *See Callahan*, 193 F. Supp. 3d at 195 (describing the maximum balance approach situation as when "the investor withdraws his money from the Ponzi scheme and then reinvests *that money* back into the Ponzi scheme. . . . [T]he positive effect on the investor of withdrawing his money from the scheme is erased because he re-invested *the money he took out* back into the scheme . . . .") (emphases added).

Recognizing that the maximum balance approach, at a minimum,[6] requires re-investing the same withdrawals rather than new funds, the Receiver tried to determine whether CCWB and EBC reinvested the money they withdrew. He could not. The Receiver submitted a declaration from its Princeton-educated financial guru stating under penalty of perjury that the CCWB's and EBC's withdrawals could not be traced to later investments. JA351–353. CCWB's and EBC's complicated transaction records made this task impracticable, if not impossible. *Id.*

For over three years, CCWB and EBC moved money back and forth—115 times combined—between their accounts and the Ponzi scheme. JA352–353, JA335–344. CCWB executed 57 cash transactions between one bank account and the Receivership Parties—21 investments totaling $22,273,700.48 and 36 distributions totaling $11,446,943.17. JA352, JA335–338. EBC executed 58 cash transactions between multiple accounts and the Receivership Parties—22 investments totaling $19,875,917.11 and 36 distributions totaling $11,945,618.76. JA352–353, JA341–344. Far from reinvesting into the Ponzi scheme "shortly after withdrawing," *Huber*, 702 F.3d at 907, CCWB and EBC sometimes waited up to *four months* before making a new investment after a set of withdrawals. JA352–353; *see, e.g.*, JA336, JA342; *see generally* JA502 (explaining that the "temporal space in between receiving these large distributions back from the Ponzi scheme, utilizing funds at their discretion, and then determining to reinvest funds at some point later is not what the dicta in

---

[6] We say "at a minimum" because courts refuse to apply the maximum balance approach even when investors reinvest the *same* money. *See Varacchi*, 2021 WL 10361074, at *3; *Coadum Advisors*, 2009 WL 10664889, at *7.

*Huber* proposes"). And except for two investments on December 14, 2017, CCWB's $513,216.99 investment and EBC's $539,030.97 investment, JA337, JA443, the next investment after the last withdrawal (or set of withdrawals) never equaled the same amount.[7] JA335–344, JA529; *cf. Huber*, 702 F.3d at 907 (discussing the maximum balance approach when the hypothetical investor reinvested the same $50,000 he withdrew).

It gets more complicated. Between withdrawals and later investments, CCWB and EBC used the same bank accounts to transact with non-Receivership Parties. CCWB deposited $9,383,478 and disbursed $683,370; EBC deposited $13,148,334 and disbursed $5,032,146. JA352–353. These non-receivership transactions included investment returns from pre-2015 investments, credit card and tax payments, and transfers to and from other Dean Investor entities, including EBC's $691,000 transfer to CCWB, CCWB's $54,559 payment to Eric Dean, and EBC's $1 million stockholder payments to Eric Dean, Bill Dean, and Casey Dean. *Id.*

If only this transaction maze involved "simpler numbers," Dean Br. 7 n.5, the Receiver could have been "certain that subsequent, ongoing investments with the Receivership Parties were made with cash received from prior distributions from the Receivership Parties." JA352; *see also* JA353 ("[I]t is not clear that subsequent investments made in the Receivership Parties were made with the same funds disbursed from Receivership Parties."). But alas, the only "certain" numbers are that CCWB invested $22,273,700.48 and received $11,446,943.17 for a 51.39% Current

---

[7] Even these two reinvestments—which sat in the Dean Investors' account for over three weeks—were not identical down to the last cent. JA337, JA443.

Recovery, and EBC invested $19,875,917.11 and received $11,945,618.76 for a 60.1% Current Recovery. JA352–353. All in all, it cannot be said that the district court abused its discretion in finding that "the sheer number of transactions between the Virginia Group entities and the Merrill Ponzi Scheme is such that identifying and tracing the origin of all of the Group's funds for each reinvestment would be impracticable." JA573.

Rather than show how the Receiver could apply the maximum balance approach faithfully, the Dean Investors conceded that the Receiver could treat disbursements to non-Receivership Parties as pre-receivership recoveries. JA443–444. This concession did not, however, "moot[]" administrative difficulty. Dean Br. 10. That is because the Dean Investors' "simple and straightforward" formula does not apply *Huber*'s maximum balance approach. *Id.* at 14.

The bottom line is that the Dean Investors ignore a key variable. Besides CCWB's and EBC's disbursements, they were also *depositing* new money into their accounts. JA352–353. These deposits were not "de minimis." JA511 (alteration omitted). CCWB and EBC deposited $9,383,478 and $13,148,334 into their accounts from outside sources during the three years they transacted with the Receivership Parties. JA352–353. This commingling thwarted the Receiver's ability to determine whether CCWB and EBC were reinvesting the same money that left the Ponzi scheme—a problem not solved by conceding disbursements as pre-receivership recoveries. *Id.* (explaining that CCWB's and EBC's reinvestments could not be calculated due to, among other things, "alternative sources of cash receipts" and "the comingling [sic] of funds from multiple sources"); *see generally* JA353, 355–434

25

(attaching an EBC bank reconciliation report for September 2016 showing the complexity of determining "whether subsequent investments were reinvestments of the same cash or new cash from other sources"). Once the Receiver could not match up withdrawals and reinvestments dollar-for-dollar, fairness to other investors required treating all the Dean Investors' investments as new investments under the Rising Tide method.

M.C. Dean foils this complexity. Unlike CCWB and EBC, M.C. Dean had two bank accounts to transact only with the Receivership Parties, save for one $45,876 transaction. JA353. M.C. Dean's bank records were also much simpler, having transacted with the Receivership Parties only 19 times over one year. JA353, JA347–348. It was thus "clearer which subsequently invested funds were made from Receivership Party distributions." JA353. That said, "investors who are 'similarly situated' should be treated consistently in a distribution plan." *SEC v. Morgan*, 2020 WL 6536894, at *6 (W.D.N.Y. Nov. 6, 2020) (citation omitted); *accord Cap. Consultants*, 397 F.3d at 738–39 ("[E]quity demands equal treatment of victims in a factually similar case."); *SEC v. Credit Bancorp, Ltd.*, 2000 WL 1752979, at *28 (S.D.N.Y. Nov. 29, 2000) ("[S]imilarly-situated investors [should be] treated alike."). Finding that the maximum balance approach would be administratively difficult as to CCWB and EBC justified the district court's discretionary decision to reject it across the board.

This process—matching up withdrawals and reinvestments in CCWB and EBC's tangled transaction web—is what the Receiver described as making a "subjective judgment call." JA503. The subjectivity involves asking not "whether funds went back into the Ponzi scheme." Dean Br. 25. The Receiver recognizes that "a

large percentage" did. JA503. The subjectivity involves asking *which* funds went back into the Ponzi scheme—a question not answered by conceding disbursements as pre-receivership recoveries. *But see* Dean Br. 24–25. To identify true reinvestments—not new money going into the Ponzi scheme—"the Receiver would be required to trace all those transactions and then make a subjective judgment call" on which funds were "legitimately [] reinvested." JA503. So rather than "make a judgment call on what equates to [a] reinvestment," the Receiver chose the Rising Tide method, an "objective" analysis that obviated the need "to dive into the details to make these subjective decisions."[8] JA529–530.

Nothing evidences the Dean Investors' maximum balance approach misunderstanding more than their claim that CCWB's total principal invested ($11,100,374) is "undisputed." Dean Br. 19; *see* JA276. For one, this claim lacks any factual basis. $11,100,374 appears only in the Dean Investors' papers, and although the Receiver identified CCWB's two "numbers the Court can be certain of," this was not one of them. *Compare* JA252, JA276, *and* JA564, *with* JA322. The Receiver has always calculated CCWB's total investment as $22,273,700.48. JA321–322, JA338, JA352.

But more to the point, calculating the Dean Investors' total investment is *the* point of contention between the Dean Investors and the Receiver. In fact, this is *always* the point of contention between the Rising Tide method's strict application and

---

[8] To be sure, the maximum balance approach need not always involve subjectivity. The Receiver acknowledged that "[t]here could be circumstances in which [it] might be acceptable." JA500.

the maximum balance approach. The Rising Tide method counts all investments, including "reinvestments," towards an investor's total investment; the maximum balance approach ignores reinvestments after withdrawals. *See, e.g.*, *Huber*, 702 F.3d at 907 (comparing $200,000 balance under the Rising Tide method with $150,000 balance under the maximum balance approach); *Varacchi*, 2021 WL 10361074, at *11 (deciding whether to calculate the claimant's investment as $7,100,921 (Rising Tide) or $5,100,921 (maximum balance) based on the extra $2 million distribution and reinvestment). Put simply, if CCWB's total investment were undisputed, there would be no need to appeal.

Aside from using a formula that does not capture *Huber*'s maximum balance approach, the Dean Investors' inconsistent numbers underscore why the Receiver cannot accurately apply the maximum balance approach here. *See* JA573 (agreeing that the maximum balance approach is "prone to inaccuracies"). In objecting to the Receiver's distribution plan, the Dean Investors first calculated CCWB's and EBC's retained cash—cash withdrawn but not reinvested—as $273,862 and $498,034. JA261–262, JA276. Then, after the Receiver challenged these calculations, the Dean Investors revised their Current Recovery to account for disbursements from CCWB's and EBC's accounts. JA443. But rather than use the Receiver's disbursement calculations, the Dean Investors calculated disbursements differently— $551,414 for CCWB and $2,817,269 for EBC. *Compare* JA446, *with* JA352–353. Using these numbers, CCWB revised its Current Recovery to 7.43%—almost 5% higher—and EBC revised its Current Recovery to 39.33%—over 33% higher than before. *Compare* JA446, *with* JA276.

28

Between the Dean Investors' surreply and the objection hearing, CCWB's number changed (again).[9] Rather than calculate its pre-receivership recovery using its disbursement calculation ($551,414), CCWB used the Receiver's ($683,370). *Compare* JA563, *with* JA446. And rather than use its original retained cash calculation ($273,862), CCWB used $125,509.90—a new number that the Dean Investors also call "undisputed" despite this number contradicting their previous calculation and appearing nowhere in the record until their objection hearing presentation. Dean Br. 19. *Compare* JA563, *with* JA261. CCWB then asked for a *third* Current Recovery using these numbers.[10] *Compare* JA563 (7.29%), *with* JA276 (2.5%), *and* JA446 (7.43%).

On this record, the district court did not abuse its discretion in finding that the maximum balance approach would be administratively difficult to apply to the Dean Investors' claims and prone to inaccuracies. JA572–573.

---

[9] Without citing testimony, the Dean Investors twice assert that the Receiver did not "challenge" or "contradict[]" their presentation at the hearing. Dean Br. 18, 25; *see* JA517–522. The Dean Investors did not, however, "establish[]" anything at the hearing. Dean Br. 18. The Receiver's counsel acknowledged that she "understood the math that was shared with the Court or at least the presentation" before offering "a couple of things that . . . put this into perspective" and explaining why applying the maximum balance approach here would require "judgment calls on what could be classified as a pure reinvestment." JA528–530 (alterations omitted).

[10] The Dean Investors did not present EBC's calculations at the hearing because using the Receiver's disbursement calculations would leave EBC in no better a position than before. Because EBC disbursed over $5 million from its accounts, EBC would realize a 59.7% Current Recovery even before accounting for retained cash— well above the 48.86% tide and almost identical to the Receiver's calculated 60.1% Current Recovery. JA446, JA353.

**D.     The Dean Investors benefitted from their Ponzi Scheme withdrawals.**

The district court's finding that when the Dean Investors "withdrew money, there was a benefit from that withdrawal, however big or small" also supports its discretionary decision to reject the maximum balance approach. JA573. To begin with, the Dean Investors admit that they benefited from Ponzi scheme funds disbursed for personal use. JA509–511; Dean Br. 27. Indeed, they would be hard-pressed to argue that they did not benefit from the combined $5,715,516 that left CCWB's and EBC's accounts. JA352–353. Rather, they assert that the district court erred in finding that "withdrawn and reinvested funds" also conferred a benefit on the Dean Investors. Dean Br. 26–27.

This approach begs the same unanswerable question: Which funds were reinvested? Because the Dean Investors admit that they received a benefit for *this* dollar that stayed out, but not *this* one that went back in, equity and fairness require more than guesswork to decipher this allocation. *See, e.g.*, *CFTC v. Rust Rare Coin, Inc.*, 2020 WL 4904165, at *7 (D. Utah Aug. 20, 2020) (There are no articulable lines that can be drawn regarding when to count pre-Receivership disbursements and when to disregard them. . . . There is no way for the court or the Receiver to determine which of these disbursements should be ignored and which should be counted when calculating the size of each investor's claim."). Faced with an unworkable approach, the district court concluded that the Dean Investors enjoyed "a benefit and a return from being in the Ponzi scheme." JA510, JA511 ("[U]nless 100 cents on the dollars is

reinvested back, there has to be some calculation of benefit, . . . that enures [sic] to the Dean Group of some sort . . . .").

This was not some trivial benefit either. Although CCWB disbursed only $683,370, what the Dean Investors call a "relatively small amount" compared to "the vast majority of withdrawals," Dean Br. 27, EBC disbursed $5,032,146, about 42% of its Ponzi scheme withdrawals ($11,945,618.76). JA352–353. Together, as the district court considered below, CCWB and EBC disbursed 24% of their total withdrawals for personal use. JA352–353. In brief, the undisputed benefit accruing to the Dean Investors from participating in and withdrawing money from the Ponzi scheme, "however big or small," supported the district court's discretionary decision to reject the maximum balance approach. JA573.

What is more, the district court's order did not pigeonhole its finding on benefit to the court's "thinking" at the hearing. Dean Br. 26. Rather, it found that "when each entity withdrew money, there was a benefit from that withdrawal, however big or small." JA573. This broad finding need not exclude the Receiver's position that the Dean Investors "had the benefit of access to the funds that other victims didn't." JA502. Nor is this idea of benefit "flawed." Dean Br. 28. In rejecting the not-yet-coined maximum balance approach, *Coadum Advisors* agreed that mere access to Ponzi scheme funds confers a benefit "regardless of how [investors] spent or reinvested those withdrawals": "[S]uch money was cash in hand that the [investors] could have spent, saved, or invested in any manner that they saw fit." 2009 WL 10664889, at *7–*8. Even if the Dean Investors had "quickly reinvested those funds" in the Ponzi scheme—which they did not do—it would still "not mean that

31

the money was any less theirs to invest elsewhere, save, or spend." *Id.* at *7. Like the court in *Coadum*, the district court acted within its discretion to decline to "provide a windfall" to the Dean Investors "who consciously made substantial pre-receivership withdrawals and benefitted immediately from having that money on hand." *Id.*

On this point, the Dean Investors, not the Receiver, "misread[] *Huber*." Dean Br. 28. *Huber* did not "correctly determine[]" anything, let alone "that the investor did not benefit from having mere access" to reinvested funds. *Id.*; *see also* Dean Br. 26 (construing the district court's finding on benefit as an "attempt[] to distinguish *Huber*"). *Huber*'s off-the-cuff, one-paragraph tangent on the maximum balance approach—admittedly not Judge Posner's "most careful, focused thinking," *Wilder*, 153 F.3d at 803—made no finding on benefit. *See Huber*, 702 F.3d at 907. This issue was neither briefed nor "anchored by the particular facts of that dispute." *Wilder*, 153 F.3d at 803; *see Huber*, 702 F.3d at 908 ("Although one of the appellants told the district court that he had withdrawn money and reinvested it continually, he has given no details . . . ."). In essence, the Dean Investors ask this Court to reverse for abuse of discretion based on an inference from dictum in another case. Reaching "a definite and firm conviction that the court below committed a clear error of judgment" requires a little—nay, much more—than that. *Morris*, 448 F.3d at 277.

The Receiver's roll-over distributions' treatment reflects its approach that access to funds confers a benefit. Roll-over distributions, "illusory profits" that never touched the Dean Investors' accounts, conferred no benefit on the Dean Investors.[11]

_____

[11] *SEC v. Byers,* 637 F. Supp. 2d 166 (S.D.N.Y. 2009) is irrelevant. *Byers* considered whether to credit roll-over distributions toward investors' total investments,

*CFTC v. Barki, LLC*, 2009 WL 3839389, at *2 (W.D.N.C. Nov. 12, 2009). With-drawals, on the other hand, did. A benefit accrued because these withdrawals did not make a clean "round trip" back into the Ponzi scheme. Dean Br. 30. In fact, the Receiver could not figure out whether the withdrawals ever meandered their way back. That is the point. The Dean Investors received distributions from the Ponzi scheme and disbursed funds for personal use, all the while depositing new money into the bank accounts used to invest with the Receivership Parties. When the Dean Investors were told they "had payments coming," Dean Br. 29, they did not view these payments as "capital" investment refunds; they viewed them as investment "profits" to use as they pleased. *Id.* at 2, 7 n.4. And they did. They moved money around for months before investing back into the scheme in different amounts than what came out. *See* JA335–348. That is the "relevant difference." Dean Br. 30.

In sum, the district court had more than one good reason to exercise its broad discretion to overrule the Dean Investors' objection to the distribution plan. Apply-ing "narrow" appellate scrutiny, this Court should affirm the district court's order. *Wealth Mgmt.*, 628 F.3d at 332.

---

not "towards the investor's recovery." *Compare Byers*, 637 F. Supp. 2d at 182, *with* Dean Br. 30. The receiver credited investors with fictional roll-over distributions when calculating their claims because under the net loss distribution method, which disadvantages investors who did not withdraw funds during the scheme, ignoring the rolled-over amounts would have "further penalize[d] those investors who chose to roll over their investments rather than receive them in cash." *Byers*, 637 F. Supp. 2d at 183. *Byers* confirms—if there is any takeaway from this inapt comparison—that the court must weigh equity based on the facts at hand.

II.    **The district court did not abuse its discretion in approving the distribution plan's collateral offset provision.**

Like many courts before, the district court found that the Receiver's collateral offset provision for third-party recoveries ensured that no claimant received a disproportionate recovery. As a "court of review, not first view," *Biggs v. N.C. Dep't of Pub. Safety*, 953 F.3d 236, 243 (4th Cir. 2020), this Court need not ask whether this offset was perfect. It need only ask whether the district court abused its discretion in finding that the distribution plan was fair and equitable as a whole. Because it did not, this Court should affirm.

A.    **Collateral offset provisions in receiverships help equalize investors' recoveries.**

The Connaughton Investors cannot credibly argue that the district court abused its discretion in approving the distribution plan's collateral offset provision. In an equitable receivership, "[a] judge is allowed to reduce a judgment in his own court to reflect the amount a plaintiff has already received from another party or in another proceeding." *Cap. Consultants*, 397 F.3d at 742; *see also Parish*, 2010 WL 5394736, at *9 (noting as a "general principle" that considering collateral recoveries is "appropriate" and "promote[s] an equitable distribution"). For this reason, courts often approve collateral offsets in equitable receiverships. *See, e.g., SEC v. McGinn, Smith & Co.*, 2016 WL 6459795, at *3–*4 (N.D.N.Y. Oct. 31, 2016); *Parish*, 2010 WL 5394736, at *9–*10; *Cap. Consultants*, 397 F.3d at 738–41; *SEC v. Wang*, 944 F.2d 80, 87–88 (2d Cir. 1991); *In re The Reserve Fund Sec. & Derivative Litig.*, 673 F. Supp. 2d 182, 201 (S.D.N.Y. 2009); *Wealth Mgmt.*, 628 F.3d at 336; *accord People v. Merkin*, 194 A.D.3d 657, 658, 150 N.Y.S.3d 45 (N.Y. App. Div.) (approving

34

receiver's distribution plan that took "into account any 'collateral recoveries' the investor might have received").

A collateral offset provision for third-party recoveries is neither "improper [n]or inequitable" in crafting a fair and reasonable distribution plan. *McGinn*, 2016 WL 6459795, at *3. Because an investor's collateral recovery "related to a loss he or she suffered by investing" in a Ponzi scheme "necessarily reduces that investor's loss," *Parish*, 2010 WL 5394736, at *9, the offset provision helps avoid "a disproportionate or double recovery," *McGinn*, 2016 WL 6459795, at *1; *see* JA574 (rejecting Connaughton Investors' objection because they would receive "a disproportionately higher recovery on their investment as compared to other victims" (citation omitted)). On the other hand, ignoring collateral recoveries, as the Connaughton Investors propose, "would make for a more inequitable distribution of assets by recognizing more loss than [investors] actually suffered." *Cap. Consultants*, 397 F.3d at 738. To illustrate, had the Receiver ignored the Connaughton Plaintiffs' collateral recoveries, "the Connaughton Plaintiffs would receive total recoveries between 75.51% on the low end and 90.03% on the high end, with an average recovery of 82.95% based on a $50,000,000 initial distribution."[12] SA68. In contrast, most investors would recover only the minimum 48.86% tide in the initial distribution.

---

[12] Although no Connaughton Plaintiff stood to receive a "double recovery" in the initial $50 million distribution, the receivership estate holds another $14 million, JA532, and the Receiver anticipates obtaining more funds after he sells the remaining assets and after he pursues third-party recoveries. JA223, SA8. Given these high recoveries, some Connaughton Plaintiffs could profit off the Ponzi scheme at other investors' expenses if the Receiver ignored collateral recoveries. SA68.

Rather than challenge "whether, in the aggregate, the plan is equitable and reasonable," which they cannot do, *Wang*, 944 F.2d at 88, the Connaughton Investors argue only that "the collateral offset provision is inequitable *to them*," *McGinn*, 2016 WL 6459795, at \*4 (emphasis in original); *see* JA544 (arguing that the offset as applied to them is "not fair," "not equity," and "certainly not equality"). "Courts, however, should consider all investor victims when crafting an equitable remedy." *McGinn*, 2016 WL 6459795, at \*4; *see, e.g.*, *Parish*, 2010 WL 5394736, at \*9 (rejecting a minority of investors' objections that obstructed a fair result to most investors); *Horwitt*, 2023 WL 192500, at \*2 ("While this distribution plan is to Flatiron's detriment, that alone demonstrates neither that the district court did not meet the 'fair and reasonable' standard nor that it abused its discretion."). As in *McGinn*, "the vast majority of investors who do not otherwise qualify for outside recovery would receive a smaller payout without the offset." 2016 WL 6459795, at \*4; *compare* SA68 (explaining that without an offset provision, "the rising tide percentage would be lower as less money would be available for the remaining claimants"), *with SEC v. Credit Bancorp, Ltd.*, 290 F. Supp. 2d 418, 424 (S.D.N.Y. 2003) (accepting receiver's proposal to ignore collateral recoveries where objectors would not be "worse off if other customers do not have their distributions reduced due to recoveries from other sources"). So not only would the Connaughton Investors reap a "disproportionate percentage" of their claim, *McGinn*, 2016 WL 6459795, at \*3, but everyone else would also get less. Nothing is fair or equitable about that.

"When funds are limited, hard choices must be made." *Off. Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 84 (2d Cir. 2006) (citation

omitted)). Because "equality is equity," *Cunningham v. Brown*, 265 U.S. 1, 13 (1924), a collateral offset is "a reasonable solution to allocating [] limited recoveries," *McGinn*, 2016 WL 6459795, at *3. Given the collateral offset provision's sensibility, this Court cannot form "a definite and firm conviction" that the district court made "a clear error of judgment" approving this reasonable solution. *Morris*, 448 F.3d at 277.

**B.    The collateral source rule and bankruptcy do not require ignoring collateral recoveries in receiverships.**

The Connaughton Investors make an array of arguments to support ignoring collateral recoveries. None are persuasive. But even if these arguments had merit, they are not so compelling to show that the district court abused its discretion in approving the collateral offset provision.

Pointing to other "contexts," the Connaughton Investors first contend that the collateral source rule bars the Receiver from considering collateral recoveries. Connaughton Br. 12–13. Not so. The collateral source rule "is this: [W]hen the victim of a tort receives payment for his injuries from a collateral source, that is, a source independent of the tortfeasor, the payment should not be deducted from the damages owed by the tortfeasor."[13] *Ward v. Allied Van Lines, Inc.*, 231 F.3d 135, 139 (4th Cir. 2000). This common-law rule is inapplicable for two reasons.

---

[13] The Connaughton Investors cite no authority to explain why Maryland common law would apply to an SEC receivership in federal court. Connaughton Br. 12; *but see Danner v. Int'l Freight Sys. of Wash., LLC*, 855 F. Supp. 2d 433, 475–76 (D. Md. 2012) (noting that "it is irrelevant whether the collateral source rule applies to contract claims under Maryland law" when a federal law claim remained vital) (collecting cases).

*First*, the collateral source rule's underlying policy rationale highlights its inapplicability here. The two policies underlying this rule are "(1) to punish the tortfeasor, or (2) to ensure that the injured party receives benefits for which he or she has contracted." *Chisholm v. UHP Projects, Inc.*, 205 F.3d 731, 737 (4th Cir. 2000) (citation omitted). As the Ninth Circuit explained in finding the collateral source rule "inapplicable" to equitable receiverships, the offset provision does not "relieve[] [the Defendants] of the consequences of their conduct." *Cap. Consultants*, 397 F.3d at 743. Rather than providing them with a "windfall," the offset provision affects only how limited receivership assets are distributed to innocent investors. *Id.*

*Second*, the Bethesda Group's settlement payment is not from "a source independent of the tortfeasor." *Ward*, 231 F.3d at 139. To be sure, the Bethesda Group's organizers are not Receivership Parties. JA211, JA542. But as the Connaughton Investors explained to the district court, Gary Day, the Bethesda Group's leader, was "hardly" "just an innocent third party." JA543. Day was in cahoots with Kevin Merrill, whom Day called "his very best friend." *Id.* While Ponzi scheme investors would receive 15% annual interest, "Day had side deals with Kevin Merrill paying at a minimum 85 percent a year and as much as 180 percent a year." JA543–544. Day would then go to casinos with Merrill and pay off "markers in the hundreds of thousands of dollars after money got into his hands from the Ponzi scheme." JA543. In short, if Day were inculpable, he would not have referred to his investors as "little people who don't ask questions." JA544.

Not surprisingly, Day and other Bethesda Group organizers were "net winners" from the Ponzi scheme—investors whose distributions from the Receivership

Parties exceeded their total investment. SA68, JA555. In other words, they profited from commingled Ponzi scheme funds that belonged to the receivership estate. At the least, the settlement proceeds represent "net winnings which would come back into the estate to be distributed."[14] JA555; *see generally* JA140 (describing the Receiver's duties to clawback net winnings and fraudulent transfers); *SEC v. Todays Growth Consultant Inc.*, 2020 WL 7027724, at *3 (N.D. Ill. Nov. 30, 2020) ("It is settled that an equity receiver has the power to bring ancillary actions to recover assets which were fraudulently transferred to investors in a Ponzi scheme." (quoting *CFTC v. Am. Commodity Grp. Corp.*, 753 F.2d 862, 866 n.6 (11th Cir. 1984))). The Bethesda Group settlement funds are thus not from a collateral source. *See, e.g.*, *Vercon Const., Inc. v. Highland Mortg. Co.*, 2005 WL 6158875, at *2 (D.S.C. July 21, 2005), *aff'd*, 187 F. App'x 264 (4th Cir. 2006) (noting that funds are not from a collateral source "because the sources do not appear completely independent of [the defendant]"); *Danner v. Int'l Freight Sys. of Wash., LLC*, 2013 WL 78101, at *23 (D. Md. Jan. 04, 2013) ("Payments from alleged joint tortfeasors do not qualify as collateral sources." (cleaned up)). In such a case, offsetting collateral recoveries would have the opposite effect: "creating an incentive for [a] detrimental 'race to the courthouse'" for receivership assets. *Parish*, 2010 WL 5394736, at *9.

---

[14] With that in mind, if any common-law principle applies, the "one satisfaction rule," which operates "to prevent the plaintiff from recovering twice from the same assessment of liability," supports the collateral offset provision here. *Chisholm*, 205 F.3d at 737. This rule applies when "the amounts recovered by settlement and the judgment"—here the Bethesda Group settlement and receivership assets—"represent common damages arising from a single, indivisible harm." *Id.*

"The bankruptcy context" also does not require ignoring collateral recoveries in equitable receiverships, much less show that the district court abused its discretion. Connaughton Br. 13. Now, equitable receiverships and liquidation bankruptcies may share an "identical" goal—distributing liquidated assets fairly. *Wealth Mgmt.*, 628 F.3d at 334. But "[a] bankruptcy receiver's duties and functions are different from those of an equity receiver, particularly because the scope of a bankruptcy receiver's power is set forth in statutes."[15] *Liberte Cap. Grp., LLC v. Capwill*, 248 F. App'x 650, 667 (6th Cir. 2007). For this reason, a bankruptcy court has "less flexibility in determining the most equitable approach to distribute assets to victims." *Byers*, 637 F. Supp. 2d at 175–76, *aff'd sub nom. SEC v. Malek*, 397 F. App'x 711 (2d Cir. 2010), *and aff'd sub nom. SEC v. Orgel*, 407 F. App'x 504 (2d Cir. 2010); *see also Malek*, 397 F. App'x at 715 (recognizing that moving a case from an equitable receivership into bankruptcy "would forfeit the latitude enjoyed by courts overseeing equity receiverships to carefully craft a particularized plan to achieve the most equitable distribution possible"). Ultimately, if any similarity can be drawn, the Connaughton Investors, "like creditors of a debtor in bankruptcy, must accept the distribution

---

[15] In *Ivanhoe Building & Loan Association of Newark v. Orr*, 295 U.S. 243 (1935), the Supreme Court held that "a creditor need not deduct from his claim in bankruptcy an amount received from a non-debtor third party in partial satisfaction of an obligation." *In re Nat'l Energy & Gas Transmission, Inc.*, 492 F.3d 297, 301 (4th Cir. 2007). Congress incorporated this holding into the bankruptcy code because "[w]hen Congress amends the bankruptcy laws, it does not write 'on a clean slate.'" *Dewsnup v. Timm*, 502 U.S. 410, 419 (1992) (citations omitted). Therefore, "Congress is presumed to have enacted the Bankruptcy Code of 1978 with an understanding of the holding of *Ivanhoe*, and to have intended to incorporate that holding into the Code . . . ." *In re Del Biaggio*, 496 B.R. 600, 602–03 (Bankr. N.D. Cal. 2012) (quoting *Dewsnup*, 502 U.S. at 419).

that the court believes appropriate." *SEC v. Enter. Tr. Co.*, 559 F.3d 649, 652 (7th Cir. 2009). To conclude, receiverships may not "*need* a different rule," but they have one. Connaughton Br. 13 (emphasis added); *see Cap. Consultants*, 397 F.3d at 742.

### C. Collateral offset provisions need not discourage future receivership claimants from pursuing third-party litigation.

The Connaughton Investors fixate on creating incentives for "future fraud victims" to recover losses from third parties. Connaughton Br. 16–17; *see also id.* at 9–14. True enough, courts have recognized the need to "balance[] the goal of encouraging [investors] to seek third-party recoveries and rewarding them for their efforts, and the goal of distributing the limited assets of the receivership in a roughly equal fashion." *Cap. Consultants*, 397 F.3d at 738. Even so, because these goals "conflict[]," like all decisions in an equitable receivership, discretion lies with the district court to weigh them. *Id.* Given this broad equitable discretion, prioritizing investors' equal treatment over incentivizing investors to seek third-party recovery is not arbitrary or irrational—"equal treatment is a legitimate goal in itself, even if it to some extent conflicts with other legitimate goals." *Id.* at 741. As in *Capital Consultants*, "creat[ing] a disincentive to pursue third-party claims" is not "so compelling" an argument to persuade this Court to find that the district court abused its discretion in approving the offset provision. *Id.*; *see also McGinn*, 2016 WL 6459795, at *2 (applying collateral offset provision over objection that "the provision is inequitable because it penalizes and disincentivizes investors from pursuing claims against third parties").

Besides, collateral offset provisions—even as "draconian" as the 100% offset accepted here, *see, e.g.*, Connaughton Br. 16, 20—need not discourage investors from seeking third-party recoveries. *See generally Cap. Consultants*, 397 F.3d at 740 ("[A]ny arguments that the [50%] offset provision in the pending case would improperly penalize those clients who made efforts to pursue claims in other proceedings would have applied with even greater force in *Equity Funding* and *Cement and Concrete*, yet we approved the 100 percent offset provisions in those cases."). An investor who pursues a third-party recovery will not lose out. Consider why an investor might seek to recover damages from third parties: Receivership assets rarely afford full recovery for all victims. As a result, if an investor has no claims against third parties or decides not to pursue such claims, the investor must accept their limited distribution from the receivership and will fare no worse than other similarly situated investors. Or, knowing that receivership assets are limited, an investor can try to recoup investment losses from third parties. In this case, there are two outcomes, and neither yields a worse result than had the investor not brought the third-party claim. First, an investor can recover more than they stood to gain in the receivership, as the Connaughton Investors did here. If this net recovery exceeds the receivership distribution, the proactive investor will make out better than the rest. But even if the investor recovers less than their receivership distribution, including nothing at all, they will be left in no worse a position than where they started—eligible for a receivership distribution that would bring their recovery up to the rising tide rate.

The Connaughton Investors contend that their collateral recovery is an "incremental benefit" and "extremely modest increase" over what they would receive

in the distribution plan. Connaughton Br. 8–9; *see also* JA548 (claiming that the Receiver's collateral offset provision is "devastating" and that "they basically get nothing for their efforts"). Hardly. The Connaughton Investors made out much better by suing the Bethesda Group's organizers than had they not. If the Receiver excluded all third-party recoveries—equivalent to a hypothetical when no claimant recovered collaterally—the rising tide would have been reduced from 48.86% to 47.34% based on a $50,000,000 interim distribution because "less money would be available" for all claimants. SA68, JA220–221 (explaining that the receiver considered an added $2,882,787.66 in collateral recoveries when calculating final claim amounts and the rising tide). Under this lower tide, if the Connaughton Plaintiff received no third-party recoveries, they would have received $376,933.12 from the receivership. SA68. In contrast, the Connaughton Plaintiffs' Bethesda Group lawsuit yielded a ▮▮▮▮▮ net recovery—over $170,000 more than if they "did nothing."[16] SA65. Not only that but the Connaughton Plaintiffs received these settlement funds at least *two years* before the receivership would distribute any assets. *Compare* SA38, *with* JA565–567.

    This settlement raised the Connaughton Plaintiffs' average recovery to 57.72%, over 10% more than the 47.34% recovery had they received no collateral

---

[16] The Receiver correctly subtracted the Connaughton Plaintiffs' costs and attorneys' fees before calculating their net pre-receivership recovery. SA3, SA65, JA544; *see Cap. Consultants*, 397 F.3d at 741 (finding no abuse of discretion in approving collateral offset provision in part because "[o]nly the net third-party recovery is deducted from the receivership claim"); *Parish*, 2010 WL 5394736, at *10 (approving collateral offset provision that "will only consider the amounts recovered by investors from third parties net of all attorneys' fees and expenses incurred in obtaining such recoveries").

recovery. SA3, SA68. So even with a 100% offset provision, investors "still have an incentive to pursue third-party claims, and are still rewarded for their efforts." *Cap. Consultants*, 397 F.3d at 741; *compare* Connaughton Br. 16–17 (arguing that the collateral offset penalizes the Connaughton Investors and allows other claimants "to get a free ride on the coattails of their more ambitious fellow victims"), *with Cap. Consultants*, 397 F.3d at 741 (rejecting argument that "the offset provision creates a free rider problem" as uncompelling).

### D. Other distribution plans' collateral offset provisions do not help this Court in reviewing the district court for abuse of discretion.

Perhaps recognizing that the district court did not abuse its discretion in approving *some* collateral offset, the Connaughton Investors argue in the alternative that the 100% collateral offset approved here is too harsh. To this end, the Connaughton Investors present a blunderbuss "range of possible outcomes" that would yield them a greater distribution. Connaughton Br. 17; *see* JA313 (calculating alternative distributions). Yet that other outcomes exist—"if the district court had"—does not compel finding an abuse of discretion because the district court approved a distribution plan with a different one. Connaughton Br. 20, 20 n.4, & 23. If anything, rather than undermine the district court, the "broad range of possibilities" supports the district court's discretion to approve an equitable distribution plan based on the facts at hand. *Id.* at 17. And besides, the Connaughton Investors fail to explain how other cases' collateral offset provisions' fine details are so fairer and more reasonable than the Receiver's offset provision that the court abused its discretion in not adopting them. In essence, the Connaughton Investors claim that any other option is so

superior to a 100% collateral offset provision that the district court abused its discretion. *But see id.* at 22 (conceding that they "would hardly recommend that any district court follow" one of their alternative calculations). Their generic request for relief sums this up: "[I]nstruct the district court . . . with instructions to reduce the Collateral Recovery Offset." *Id.* at 26; *see also id.* at 17 (asking this Court to "direct the district court to modify the distribution accordingly").

At any rate, how much money the Connaughton Investors would receive if their claims were submitted under other receiverships' collateral offset provisions is irrelevant. This Court does not "ask whether [it] would have come to the same conclusion as the district court if [it] were examining the matter *de novo*." *Morris*, 448 F.3d at 277; *see, e.g.*, *Wang*, 944 F.2d at 88 ("Were we drafting the Plan, we might well have decided . . . to ignore the pre-existing inventory positions of each seller— as Susquehanna requested and the SEC declined to do. . . . This kind of line-drawing—which inevitably leaves out some potential claimants—is . . . appropriately left to the experience and expertise of the SEC in the first instance."). This Court asks only whether the district court abused its discretion in finding that the Receiver's proposed distribution plan was fair and equitable.

Equity, the quality of fairness and impartiality, must be determined "with reference to the facts of the particular case." *Kansas v. Nebraska*, 574 U.S. 445, 465 (2015) (citation omitted); *see also CFTC v. PrivateFX Glob. One*, 778 F. Supp. 2d 775, 781 (S.D. Tex. 2011) ("[B]ut if the court were to agree that the P.B. Ventures court's decision was fair and equitable under the facts of that case, it certainly would not lead to the conclusion that a similar result is fair and equitable in this case."); *Barki*, 2009

WL 3839389, at *2 ("[T]he facts of a given case dictate [what is] most equitable."). The receivers in *Parish*, *Capital Consultants*, and *McGinn* crafted a collateral offset provision that fit those unique receiverships' particular facts. *See* Connaughton Br. 18–24. The Receiver did the same here. *See* JA220–221.

In like manner, the key thread linking collateral offset cases is district courts adopting the *receiver's* proposal for treating collateral recoveries. *See, e.g.*, *Cap. Consultants*, 397 F.3d at 738, 741 (affirming district court order approving receiver's revised collateral offset provision); *Parish*, 2010 WL 5394736, at *10 (adopting receiver's "revised recommendation" after receiver "agree[d] with the objecting investors that it will be more equitable to treat third-party recoveries as reductions from investors'" total investments); *McGinn*, 2016 WL 6459795, at *4 ("In balancing the equities, the court agrees that the collateral offset provision as drafted by the Receiver is fair and reasonable."); *Credit Bancorp*, 290 F. Supp. 2d at 424 (overruling objection to distribution plan's treatment of collateral recoveries because the receiver argued that collateral recoveries should be ignored); *see also Wealth Mgmt.*, 628 F.3d at 336 (affirming district court order adopting receiver's "cutoff date to determine which redemptions to offset"). That is because "a court may defer to the receiver's choices for the plan's details and should give substantial weight to the SEC's views regarding a plan's merits." *SEC. v. Amerindo Inv. Advisors Inc.*, 2014 WL 2112032, at *14 (S.D.N.Y. May 6, 2014), *aff'd sub nom. SEC v. Amerindo Inv. Advisors*, 639 F. App'x 752 (2d Cir. 2016); *see also SEC v. Quan*, 2015 WL 8328050, at *6 (D. Minn. Dec. 8, 2015), *aff'd*, 870 F.3d 754 (8th Cir. 2017) ("A distribution plan that is supported by both the SEC and the receiver is entitled to deference from

the Court."); *see, e.g., Byers*, 637 F. Supp. 2d at 175 (deferring to receiver's proposed distribution plan that the SEC supported).

Here, the Receiver crafted the distribution plan with the SEC's input. JA210. With no evidence that the district court acted arbitrarily, irrationally, or based on a wrong legal or factual premise in approving the distribution plan, this Court need not look further with its "deferential standard-of-review applicable to decisions of this kind." *Wealth Mgmt.*, 628 F.3d at 327. This Court should affirm the district court's order.

## CONCLUSION

"[A] small pie and many disappointed investors" create an inherent conflict. *Parish*, 2010 WL 5394736, at *5 (citation omitted). Unable to make everyone (or anyone) happy, the only question is "whether a distribution is equitable and fair in the eyes of a reasonable judge." *Enter. Tr.*, 2008 WL 4534154, at *3. Judge Richard Bennett, the reasonable, seasoned judge below, viewed the distribution plan as equitable and fair. At bottom, this Court should "hesitate to second-guess a discretionary decision made by the district court concerning a complicated matter with which it had an intimate working knowledge for more than [four] years." *SEC v. An-Car Oil Co.*, 604 F.2d 114, 119 (1st Cir. 1979).

For all these reasons, this Court should affirm the district court's order overruling Appellants' objections to Receiver Gregory S. Milligan's Motion for Order Approving Distribution Plan and Interim Distribution.

Respectfully submitted,

/s/ *Danny G. Solomon*
Danny G. Solomon
1801 Pennsylvania Ave. NW,
Suite 1000
Washington, DC 20006
Telephone: (202) 378-2391
Facsimile: (202) 378-2319
danny.solomon@huschblackwell.com

and

Lynn H. Butler
Jameson J. Watts
HUSCH BLACKWELL LLP
111 Congress Ave., Ste. 1400
Austin, TX 78701
Telephone: (512) 472-5456
Facsimile: (512) 479-1101
lynn.butler@huschblackwell.com
jameson.watts@huschblackwell.com

and

Buffey E. Klein
HUSCH BLACKWELL LLP
1900 N. Pearl Street, Ste. 1800
Dallas, TX 75201
Telephone: (214) 999-6100
Facsimile: (214) 999-6170
Buffey.klein@huschblackwell.com

*Counsel for Receiver-Appellee*
*Gregory S. Milligan*

## REQUEST FOR ORAL ARGUMENT

This appeal raises important questions about distribution methods in equitable receiverships. Oral argument would help the Court decide the issues presented by this appeal.

## CERTIFICATE OF COMPLIANCE

This Respondent Brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,998 words, excluding the parts exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5)(A) and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Equity font.

/s/ *Danny G. Solomon*
Danny G. Solomon

## CERTIFICATE OF SERVICE

I certify that on May 11, 2023, I electronically filed this Receiver-Appellee's Response Brief with the Clerk of the Court for the Fourth Circuit using the CM/ECF system. The CM/ECF system will serve all participants.

/s/ *Danny G. Solomon*
Danny G. Solomon